J-S06011-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TROY WALKER | |
| Appellant | No. 630 EDA 2016 |

Appeal from the Judgment of Sentence October 19, 2015
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0000394-2014

BEFORE: MOULTON, J., RANSOM, J., and FITZGERALD, J.[*]

MEMORANDUM BY MOULTON, J.: **FILED JULY 14, 2017**

Troy Walker appeals from the October 19, 2015 judgment of sentence entered in the Montgomery County Court of Common Pleas following his jury trial convictions for attempted first-degree murder, aggravated assault, robbery of motor vehicle, recklessly endangering another person ("REAP"), unsworn falsification to authorities, and persons not to possess firearms.[1] We affirm.

The trial court set forth the relevant factual history as follows:

> On Sunday, October 20, 2013, at approximately 2:46 A.M., police responded to reports of a shooting at the Riverside Apartments in Norristown, Pennsylvania. As an

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 901(a); 2502(a), 2702(a)(1), 3702(a), 2705, 4904(a)(1), 6105(a)(1), respectively.

officer was arriving on the scene, his unmarked patrol car was struck by a blue Volkswagen Passat, which proceeded to exit the parking lot. The complainant, John Steven Marszuk, was found on the ground towards the rear of the parking lot, where he had been shot just under the left eye. Marszuk, who does not remember the incident, was flown to a hospital with a bullet lodged in his brain. His vehicle, the blue Volkswagen Passat which had been driven off the scene, was found abandoned in an adjacent lot, and was processed for fingerprints. One of the fingerprints which w[as] submitted to a database matched those of Defendant, Troy Walker.

On Wednesday. October 30, 2013, [Walker] accompanied two officers to a stationhouse, where he made a statement in which he denied his involvement with the crime or any personal knowledge of the complaining witness. As a result of the statement, [Walker] was charged with False Swearing. A warrant was issued for his arrest on November 5, 2013.

[Walker] was arrested on December 18, 2013, and thereafter made a statement confessing to his involvement in the crime. [Walker] claimed that he had acted in self-defense when the complaining witness had become sexually aggressive after offering to give Defendant a ride home. [Walker] stated that after shooting the complainant, he had driven away in the complainant's blue Volkswagen Passat, accidentally struck the arriving police vehicle, abandoned the complainant's car, threw his firearm into the Schuylkill River, and fled on foot.

[Walker] was thereafter charged with attempted first degree murder, aggravated assault, robbery of a motor vehicle, recklessly endangering another person, unsworn falsification to authorities, and possession of a firearm by a person not to possess. [Walker] had a preliminary hearing on January 14, 2014, after which all charges were held for court.[7] Following a trial on March 17. 2015, through March 19, 2015, [Walker] was convicted by a jury of all charges.

[7] [Walker] was also originally charged with aggravated assault on a police officer, 18 Pa.C.S.A. § 2702(a)(2), and possession of a firearm with criminal intent, 18 Pa.C.S.A. §

- 2 -

907(b), for which an order of *nolle prosequi* was later entered.

On September 2, 2015, [Walker] filed a Motion for Extraordinary [R]elief on the basis of a tainted juror, which was denied on October 2, 2015, after a hearing.

[Walker] was sentenced on October 19, 2015, to fifteen and a half to thirty-one years of incarceration in a state correctional institution (with a concurrent sentence of six to twelve years' incarceration), three years of consecutive probation (with two other concurrent sentences of two years' probation), and to pay restitution.

On October 29, 2015, [Walker] filed a post-sentence motion, raising in part the denial of [Walker's] Motion for Extraordinary Relief and requesting leave to supplement the record with the questionnaire of the challenged juror. On November 3, 2015, this Court issued an order granting leave to supplement the record with the juror questionnaire within twenty days and stating that "In default thereof, same motion is DENIED." [Walker] did not supplement the record with the juror questionnaire by November 23, 2015.

[Walker's] counsel failed to file a notice of appeal within thirty days of the automatic denial of the post-sentence motion (December 23, 2015). On February 5, 2016, [Walker's] counsel filed a Motion for *Nunc Pro Tunc* Appeal, claiming that this Court's order of November 3, 2015, was unclear as to whether the Court intended to deny in full [Walker's] post-sentence motion on November 23, 2015, and that [Walker's] counsel had been therefore unaware that the time period in which to file an appeal had expired on December 23, 2015. This Court was persuaded by counsel's argument, and on February 11, 2016, granted [Walker] leave to appeal *nunc pro tunc*.[8] [Walker] filed a notice of appeal on February 26, 2016.

[8] Documents sent directly from [Walker] and filed with the Clerk of Courts on January 27, 2016, (sent from the prison on December 17, 2015) indicated [Walker's] timely desire to appeal his judgment of sentence. [Walker] also submitted a *pro se* request to appoint new

counsel on December 2, 2015, which was denied on January 7, 2016.

Opinion, 5/3/16, at 1-3 (some footnotes omitted) ("1925(a) Op.").

On appeal, Walker raises the following issues:

1. The trial court erred in failing to suppress [Walker's] statements taken on November 2, 2013, and December 18, 2013.

2. The trial court erred in allowing detective [Albert] Dinnell to certify to the jury that his opinion had the stamp of approval of the scientific community.

3. The trial court erred in denying the defense motion for extraordinary relief where a juror failed to reveal prior to or during trial that he worked at a juvenile delinquency institution and that he had prior contact with [Walker] at that institution.

4. The trial court erred in overruling the defense objection to the statement by the prosecutor in her closing that, "if you believe the defense you have been lied to . . . ."

5. The trial court erred in allowing a police officer to testify specifically that he could determine that [Walker's] cell phone was in the area of the crime by checking nearby cell phone towers.

6. The evidence was insufficient as a matter of law to find [Walker] guilty of attempted first degree murder and the companion charges of robbery of a motor vehicle, aggravated assault and reckless endangerment.

Walker's Br. at 13.

## I. Motion to Suppress

Walker first challenges the trial court's denial of his motion to suppress the statements he made on November 2, 2013 and on December 18, 2013. He maintains the trial court should have suppressed his November 2, 2013 statements because the questioning constituted a custodial interrogation and

- 4 -

he was not provided *Miranda*[2] warnings. He maintains the trial court should have suppressed his December 18, 2013 statements because the police lacked probable cause to arrest him and, therefore, the statements were the fruit of an illegal arrest.

When reviewing a denial of a suppression motion, we must determine whether the record supports the trial court's factual findings and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Brown*, 64 A.3d 1101, 1104 (Pa.Super. 2013). We may only consider evidence presented at the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1085-87 (Pa. 2013). In addition, because the Commonwealth prevailed in the suppression court, we consider only the Commonwealth's evidence and so much of the defense evidence "as remains uncontradicted when read in the context of the record as a whole." *Brown*, 64 A.3d at 1104 (quoting *Commonwealth v. Cauley*, 10 A.3d 321, 325 (Pa.Super. 2010)). We may reverse only if the legal conclusions drawn from the facts are in error. *Id.*

### A. November 2, 2013 Statements

Walker contends that he was subject to a custodial detention on November 2, 2013 and that the statements made to police on that day are inadmissible because the police did not provide *Miranda* warnings. He maintains that on November 2, 2013, just one day after his eighteenth

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

birthday, the police requested that he accompany them to the police station under the false premise that they wanted to speak with him regarding his juvenile probation. He maintains that he was a special education student and that the conversation occurred without his parents' presence or knowledge. Thus, he claims that the statements were coerced and involuntary and the trial court erred in denying his motion to suppress the statements.

The trial court concluded that under the totality of the circumstances, Walker was not in custody on November 2, 2013 and, therefore, it denied the motion to suppress statements made on that date. 1925(a) Op. at 10-15. It noted that Walker's age is only one factor used to determine whether a custodial detention occurred. *Id.* at 10-11. It further concluded that, although the "probation officers used a certain level of deception to obtain [Walker's] presence in the station, this does not contradict that [Walker] was not in custody at the time he gave the statement, or that he gave it voluntarily." *Id.* at 14. The trial court noted that the officers did not make any promises or threats to Walker and that when he made the statement Walker "was fully aware of both the real reason he was being questioned and of his right to leave." *Id.* at 15. After a review of the briefs, the record, the relevant case law, and the well-reasoned opinion of the Honorable Garrett D. Page, we conclude the trial court's factual findings are supported

by the record and its legal conclusions are not in error. We agree with and adopt the trial court's reasoning. *See* 1925(a) Op. at 10-15.[3]

## B. Affidavit of Probable Cause and the December 18, 2013 Statements

Walker next contends that the warrant for his arrest for unsworn falsification to authorities was not based upon probable cause and, therefore, the arrest was illegal and any statements made after the arrest are inadmissible. He contends that the affidavit of probable cause presented to the judge in support of the arrest warrant contained a material misrepresentation because it stated that Walker told the police officers that he *never* touched the car, where, at the interview, Walker told the police officers he did not touch the car on October 20, 2013.

The trial court concluded that Walker's arrest was supported by probable cause. 1925(a) Op. at 15. The trial court found that the statement in the affidavit "d[id] not rise to the level of false statements made with reckless disregard for the truth." *Id.* at 18. The court found that the affiant's interpretation of Walker's November 2, 2013 statement "was neither patently false nor did it amount to a gross deviation from reasonable

---

[3] The trial court stated the facts herein "align closer with those of [**Commonwealth v.**] **Cooley**[, 118 A.3d 370 (Pa. 2015)] than [**Minnesota v.**] **Murphy**[, 465 U.S. 420 (1984)]." 1925(a) Op. at 13. It is clear from the cases and from the parenthetical citations provided by the trial court, *id.* at 13-14, that the trial court actually found the facts "align closer with those of [**Murphy**] than [**Cooley**]," *id.* at 13.

conduct, particularly at the probable cause level." *Id.* at 19. It further concluded that although "the existence of two interpretations to the question arguably meant that there was insufficient evidence at the time for a conviction of unsworn falsification at the 'beyond a reasonable doubt' standard, the totality of the circumstances, including the common sense interpretation of the question (and [Walker's] negative answer), provides ample probable cause for arrest on that charge." *Id.* at 20-21.

After a review of the briefs, the record, the relevant case law, and the well-reasoned opinion of Judge Page, we conclude that the trial court's factual findings are supported by the record and its legal conclusions are not in error. We agree with and adopt the trial court's reasoning. *See* 1925(a) Op. at 15-21.

## II.    Admissibility of Fingerprint Expert Testimony and Cell Phone Expert Testimony

In Walker's second and fifth claims, he challenges the admission of testimony from two experts, a fingerprint expert and a cell phone expert.

We review a challenge to the admission of evidence for an abuse of discretion. *Commonwealth v. Antidormi*, 84 A.3d 736, 749 (Pa.Super. 2014).

### A.  Fingerprint Expert

Walker maintains the trial court erred in overruling his objection to the testimony of Detective Albert Dinnell. Walker objected to Detective Dinnell's testimony that it was his opinion, to a reasonable degree of **scientific**

certainty, that the fingerprint located on the victim's car matched Walker's. Walker maintains that fingerprint analysis is subjective and not based on science and that, although a fingerprint expert can give an opinion, the expert cannot claim the opinion is based on science.

The trial court concluded Walker did not object to the underlying scientific methodology used by requesting a *Frye* hearing and presented no ground "for this Court to believe that a *Frye* hearing was warranted." 1925(a) Op. at 34. The trial court also noted that Walker successfully cross-examined Detective Dinnell and that Detective Dinnell was qualified as an expert. *Id.* at 36-37. After a review of the briefs, the record, the relevant case law, and the well-reasoned opinion of Judge Page, we conclude that the trial court did not abuse its discretion when it overruled Walker's objection. We agree with and adopt the trial court's reasoning. *See* 1925(a) Op. at 34-37.

### B. Cell Phone Expert

Walker next maintains the trial court erred when it allowed an expert to testify to a reasonable degree of scientific certainty that Walker's cell phone was in the area. Walker maintains that a cell phone expert can determine what tower picked up the cell phone signal, but not that the phone was in the vicinity.

The trial court concluded Walker's issue lacked merit where Walker vigorously cross-examined the expert, the expert was qualified, the expert's conclusions were "simplistic," and Walker did not request a *Frye* hearing.

1925(a) Op. at 34. After a review of the briefs, the record, the relevant case law, and the well-reasoned opinion of Judge Page, we conclude that the trial court did not abuse its discretion. We agree with and adopt the trial court's reasoning. *See* 1925(a) Op. at 30-34.

## III. Juror Misconduct

Walker maintains the trial court erred in not granting a new trial where a juror failed to disclose on the juror questionnaire that he worked as a counselor at a juvenile institution.[4]

We apply the following standard of review to the denial of a new trial due to alleged juror misconduct:

> The refusal of a new trial on the grounds of alleged misconduct of a juror is largely within the discretion of the trial judge. When the facts surrounding the possible misconduct are in dispute, the trial judge should examine the various witnesses on the question, and his findings of fact will be sustained unless there is an abuse of discretion.

*Commonwealth v. Pope*, 14 A.3d 139, 145 (Pa.Super. 2011) (quoting *Commonwealth v. Russell,* 665 A.2d 1239, 1243 (Pa.Super. 1995)).

The trial court found that although the average juror would have listed all places of current employment in response to the juror questionnaire, the

---

[4] In response to a question regarding employment, a juror responded that he worked as a corrections officer at State Correctional Institution Graterford, but did not state that he also was employed at New Life Residential Program for Youth, a drug and rehabilitation residential facility for juveniles. 1925(a) Op. at 49. Walker previously was a resident at New Life. *Id.*

average juror would not have listed his or her entire employment history. 1925(a) Op. at 55. The trial court further noted that Walker failed to establish that he was prejudiced by the juror's omission of the juror's employment at the juvenile institution from the questionnaire. *Id.* The juror testified that he wondered a few days into the trial whether he recognized Walker, but it was a fleeting thought. The juror testified that he did not have any direct interaction with Walker, did not know Walker's name, and did not know for what offense Walker had been adjudicated dependent. *Id.* The trial court therefore was "not persuaded that an average juror, who had only the slightest inkling that [he or she] may have recognized a defendant from such a situation, would have been influenced in [his or her] decision-making." *Id.* at 55-56.

After a review of the briefs, the record, the relevant case law, and the well-reasoned opinion of Judge Page, we conclude that the trial court did not abuse its discretion in denying Walker a new trial. We agree with and adopt the trial court's reasoning. *See* 1925(a) Op. at 48-51, 53-56.

## IV.  Prosecutor Misconduct

Walker next argues that the trial court erred in overruling Walker's objection to statements made during closing argument by the assistant district attorney ("ADA"). Walker argues the ADA improperly stated that to find Walker not guilty the jury would have to find that "an awful lot of people that took the stand" lied to the jury. Walker maintains that this comment was improper and highly prejudicial and, thus, a new trial is required.

"Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." *Commonwealth v. Solomon*, 25 A.3d 380, 383 (Pa.Super. 2011) (quoting *Commonwealth v. Rolan*, 964 A.2d 398, 410 (Pa.Super. 2008)). Further "[i]n considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one." *Id.* (quoting *Rolan*, 964 A.2d at 410).

The trial court found that the ADA's comments were improper. 1925(a) Op. at 39. The trial court, however, was "not convinced that these remarks alone would have created fixed bias and hostility towards [Walker] in the minds of the jury, considering the general propriety of the closing statement and the fair conduct over the course of the trial." *Id.* at 39-40. The trial court further noted that it gave a prompt instruction in response to Walker's objection and provided additional instructions during the final charge to the jury that closing arguments were not to be considered evidence. *Id.* at 40. After a review of the briefs, the record, the relevant case law, and the well-reasoned opinion of Judge Page, we conclude that the trial court did not abuse its discretion in finding Walker was not deprived of a fair trial. We agree with and adopt the trial court's reasoning. *See* 1925(a) Op. at 37-40.

## V. Sufficiency of the Evidence

Walker next maintains that the evidence was insufficient to establish that he committed attempted first-degree murder, robbery of a motor vehicle, aggravated assault, or REAP.[5] He maintains the victim "began grooming [Walker] by agreeing to purchas[e] marijuana" and the victim "enticed [Walker] into his vehicle and drove" to a secluded spot in near the Riverside Apartment Complex. Walker's Br. at 64-65. The victim then became "sexually aggressive" and Walker attempted to rebuff the advances by pulling out his gun. *Id.* at 65. Walker maintains that when he exited the vehicle, the victim exited as well and "[Walker] confronted [the victim] and fired a shot which struck him below the right eye." *Id.* He further notes that there was testimony that someone shouted "leave me alone" prior to the shooting. *Id.* at 70.

We apply the following standard when reviewing a sufficiency of the evidence claim:

> [W]hether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every

_____

[5] Although Walker stated the Commonwealth did not present sufficient evidence to convict him of robbery of a motor vehicle, he does not include any discussion of this crime in the argument section of his brief. Therefore, he has waived any sufficiency challenge as to robbery of a motor vehicle. *Commonwealth v. Charleston*, 94 A.3d 1012, 1022 (Pa.Super. 2014) (finding claim waived where appellant failed to develop argument or offer pertinent legal authority).

element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Best***, 120 A.3d 329, 341 (Pa.Super. 2015) (quoting

***Commonwealth v. Harden***, 103 A.3d 107, 111 (Pa.Super. 2014)) (some

alterations in original).

### A. Attempted First-Degree Murder, Aggravated Assault, and REAP

"A person may be convicted of attempted murder 'if he takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act.'" ***Commonwealth v. Jackson***, 955 A.2d 441, 444 (Pa.Super. 2008) (quoting ***Commonwealth v. Dale****,* 836 A.2d 150, 152 (Pa.Super. 2003)). Further:

"The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence." ***Commonwealth v. Schoff****,* 911 A.2d 147, 160 (Pa.Super.2006). "[T]he law permits the fact finder to infer that one intends the natural and probable consequences of his acts[.]" ***Commonwealth v. Gease****,* 548 Pa. 165, 696 A.2d 130, 133 (1997).

***Id.*** (alterations in original).  "Specific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the victim's body." ***Commonwealth v. DeJesus***, 860 A.2d 102, 106 (Pa. 2004).

Further,

> Under the Crimes Code, a person may be convicted of aggravated assault, . . . if he or she "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life."  18 Pa.C.S.A. § 2702(a)(1).  Serious bodily injury is further defined by the Crimes Code as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

***Commonwealth v. Bruce***, 916 A.2d 657, 661 (Pa.Super. 2007).

REAP is defined as follows:

> A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

18 Pa.C.S. § 2705.  "Reckless endangerment is a lesser included offense of aggravated assault and where the evidence is sufficient to support a claim of aggravated assault it is also sufficient to support a claim of recklessly endangering another person."  ***Commonwealth v. Smith***, 956 A.2d 1029, 1036 (Pa.Super. 2008) (quoting ***Commonwealth v. Thompson***, 739 A.2d 1023, 1028 n. 13 (Pa. 1999)).

Walker merely argues that there was evidence that the victim "groomed" him by agreeing to buy marijuana and that the victim made

sexual advances. Such evidence, however, does not alter that the Commonwealth presented evidence that Walker shot the victim with the intent to kill him, including Walker's statement, which included the following:

> "[H]e started talking about that he was tricking and that he wanted to suck my dick because he needed money. We started arguing and he started talking with his hands and shit and I told him to get the fuck out of my face and we both got out of the car basically at the same time. I got out of the passenger side and he got out of the driver's side of the blue car. I walked around to the driver's side and the big white guy was leaning up against the car. I walked over to him and he stood up like he was trying to scare me so I took out my gun and I shot him in the face."

Cmwlth. Ex. C-25. We conclude that the Commonwealth presented sufficient evidence from which a jury could find beyond a reasonable doubt that Walker shot the victim in a vital part of the victim's body and that it presented sufficient evidence from which a jury could find Walker was guilty of attempted first-degree murder, aggravated assault, and REAP.

## B. Unsworn Falsification to Authorities

Walker also maintains the Commonwealth failed to present sufficient evidence to support the conviction for unsworn falsification to authorities.

The trial court found the Commonwealth presented sufficient evidence from which the jury could find beyond a reasonable doubt that Walker was guilty of unsworn falsification to authorities. 1925(a) Op. at 45-46. After a review of the briefs, the record, the relevant case law, and the well-reasoned opinion of Judge Page, we agree with and adopt the trial court's reasoning. *See* 1925(a) Op. at 45-46.

Judgment of sentence affirmed.

Judge Ransom joins in the memorandum.

Justice Fitzgerald concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/14/2017

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA     :
                                        :          No. CP-46-CR-0000394-2014
                                         :
         v.                              :
                                         :          630 EDA 2016
TROY WALKER                         :

### OPINION

Page, J.                                                          *May 3, 2016*

### FACTS AND PROCEDURAL HISTORY

On Sunday, October 20, 2013, at approximately 2:46 A.M., police responded to reports of a shooting at the Riverside Apartments in Norristown, Pennsylvania. As an officer was arriving on the scene, his unmarked patrol car was struck by a blue Volkswagen Passat, which proceeded to exit the parking lot. The complainant, John Steven Marszuk, was found on the ground towards the rear of the parking lot, where he had been shot just under the left eye. Marszuk, who does not remember the incident, was flown to a hospital with a bullet lodged in his brain. His vehicle, the blue Volkswagen Passat which had been driven off the scene, was found abandoned in an adjacent lot, and was processed for fingerprints. One of the fingerprints which were submitted to a database matched those of Defendant, Troy Walker.

On Wednesday, October 30, 2013, Defendant accompanied two officers to a stationhouse, where he made a statement in which he denied his involvement with the crime or any personal knowledge of the complaining witness. As a result of the statement, Defendant was charged with False Swearing. A warrant was issued for his arrest on November 5, 2013.



Defendant was arrested on December 18, 2013, and thereafter made a statement confessing to his involvement in the crime. Defendant claimed that he had acted in self-defense when the complaining witness had become sexually aggressive after offering to give Defendant a ride home. Defendant stated that after shooting the complainant, he had driven away in the complainant's blue Volkswagen Passat, accidentally struck the arriving police vehicle, abandoned the complainant's car, threw his firearm into the Schuylkill River, and fled on foot.

Defendant was thereafter charged with attempted first degree murder,[1] aggravated assault,[2] robbery of a motor vehicle,[3] recklessly endangering another person,[4] unsworn falsification to authorities,[5] and possession of a firearm by a person not to possess.[6] Defendant had a preliminary hearing on January 14, 2014, after which all charges were held for court.[7] Following a trial on March 17, 2015, through March 19, 2015, Defendant was convicted by a jury of all charges.

On September 2, 2015, Defendant filed a Motion for Extraordinary relief on the basis of a tainted juror, which was denied on October 2, 2015, after a hearing.

Defendant was sentenced on October 19, 2015, to fifteen and a half to thirty-one years of incarceration in a state correctional institution (with a concurrent sentence of six to twelve years' incarceration), three years of consecutive probation (with two other concurrent sentences of two years' probation), and to pay restitution.

---

[1] 18 Pa. C.S.A. § 901 (A); Pa. C.S.A. § 2502(A).
[2] 18 Pa. C.S.A. § 2702(A)(1).
[3] 18 Pa. C.S.A. § 3702(A).
[4] 18 Pa. C.S.A. § 2705.
[5] 18 Pa. C.S.A. § 4904(A)(1).
[6] 18 Pa. C.S.A. § 6105(A)(1).
[7] Defendant was also originally charged with aggravated assault on a police officer, 18 Pa. C.S.A. § 2702(A)(2), and possession of a firearm with criminal intent, 18 Pa. C.S.A. § 907(B), for which an order of *nolle prosequi* was later entered.

On October 29, 2015, Defendant filed a post-sentence motion, raising in part the denial of Defendant's Motion for Extraordinary Relief and requesting leave to supplement the record with the questionnaire of the challenged juror. On November 3, 2015, this Court issued an order granting leave to supplement the record with the juror questionnaire within twenty days and stating that "In default thereof, same motion is DENIED." Defendant did not supplement the record with the juror questionnaire by November 23, 2015.

Defendant's counsel failed to file a notice of appeal within thirty days of the automatic denial of the post-sentence motion (December 23, 2015). On February 5, 2016, Defendant's counsel filed a Motion for *Nunc Pro Tunc* Appeal, claiming that this Court's order of November 3, 2015, was unclear as to whether the Court intended to deny in full Defendant's post-sentence motion on November 23, 2015, and that Defendant's counsel had been therefore unaware that the time period in which to file an appeal had expired on December 23, 2015. This Court was persuaded by counsel's argument, and on February 11, 2016, granted Defendant leave to appeal *nunc pro tunc*.[8] Defendant filed a notice of appeal on February 26, 2016.

On March 1, 2016, this Court issued an order requesting a Concise Statement of Errors Complained of on Appeal ("Statement") pursuant to Rule 1925 of the Pennsylvania Rules of Appellate Procedure. Defendant filed his Statement on March 21, 2016, but requested leave to amend it based on the unavailability of the transcript of Defendant's sentencing hearing. The transcript became available to Defendant on March 23, 2016, and on April 7, 2016, this Court issued an Order allowing Defendant until April 15, 2016, to amend his Statement. To the date of the filing of this opinion, no supplemental or amended Statement has been filed by Defendant.

---

[8] Documents sent directly from Defendant and filed with the Clerk of Courts on January 27, 2016, (sent from the prison on December 17, 2015) indicated Defendant's timely desire to appeal his judgment of sentence. Defendant also submitted a *pro se* request to appoint new counsel on December 2, 2015, which was denied on January 7, 2016.

## ISSUES

In his Concise Statement, Defendant presents the following issues:

1. The evidence was insufficient as a matter of law to find appellant guilty of first degree murder and the companion charges of robbery of a motor vehicle and aggravated assault. The perpetrator was a large aggressive pedophile male and the Appellant at the time was a 17 year old child. Appellant was attacked and sexually molested by this aggressive pedophile – he ultimately shot the perpetrator and fled the area in his car out of fear. (NT 3-18-15 p. 13 L. 11-13). (NT 3-18-15 p. 17-20). With regard to reckless endangerment, the defendant's behavior was in no way reckless no matter whether the defendant's or the Commonwealth's version of the facts are credited. Commonwealth contends appellant's behavior was willful and premeditated. Finally, the unsworn falsification charge is not made out because the mere fact that a defendant denies a charge or a fact is not sufficient basis upon which to support the charges. Appellant's denial of the fingerprint cannot support the charge.

2. The trial court erred in failing to decertify appellant back to juvenile court. Appellant turned 18 on November 2, 2013. The incident occurred on October 20, 2013. (see Rule 600 motion). (NT 3-18-15 p. 150). The facts and circumstances of the case were such that the child/appellant was molested by a sexually aggressive pedophile. Thus the facts should not have warranted him being certified to adult court.

3. The trial court erred in questioning the witness detective Kelly in a leading fashion as to whether her investigation led to the conclusion of whether the suspect Baptiste was not involved. The trial court improperly asked the question and allowed the answer as to whether Baptiste's involvement could be determined from whether or not a revolver or automatic was used but then without any foundation at all, elicited the conclusory response from the police officer regarding his involvement. (3-18-15 p. 162); (NT 3-18-15 p. 227). Baptiste was therefore improperly eliminated as a suspect and as the actual perpetrator in the jury's eyes.

4. The trial court erred in allowing the police to be qualified as an expert to testify that they could determine that Appellant's cell phone was in the area by checking the cell phone towers. (3-18-15 p. 169-173; p. 174); (3-19-15 p. 17). The trial court erred in allowing the witness to testify to the conclusion to a reasonable degree of scientific certainty when no such standard exists for such a procedure. (3-19-15 p. 18).

5. The trial court erred in utilizing a juvenile robbery adjudication as the predicate offense for the person's not to possess charge in this case. (NT 3-19-15 p. 151).

4

6. The trial court erred in overruling the defense objection to the statement by the prosecutor in her closing that if you believe the defense you have been lied to by an awful----witnesses. It is improper for the prosecution to refer to witnesses as liars whether done facetiously or otherwise. (NT 3-19-15 p. 24).

7. The trial court erred in failing to suppress the defendant's statements made on November 2, 2013, and December 18, 2013. The defendant, a minor child, was molested by an a large adult male and while suffering from such effects was psychologically coerced by the police, who threatened his freedom by suggesting that his probation was in jeopardy which directly led to giving the first statement which was the alleged basis for the arrest for the charge of false statement to police which led to the second statement. The taint was not sufficiently attenuated prior to the arrest and the second statement being taken. Neither the defendant's parents nor a concerned adult were contacted when he was taken to the police department. (NT 3-19-15 p. 123). Moreover, he was taken to the police station and not questioned in his home or at the scene where he was comfortable. Additionally, he was not mirandized at the statement of 11-2-13. (P. 127 L. 1-6); (3-18-15 p. 153).

8. The arrest of the defendant on December 18, 2013, which led to the taking of the second statement was made without probable cause as the reason given was that he was arrested for false statements to police. Defendant gave a statement on November 2, 2013, and denied everything. (3-16-15 P. 36-38). On November 2, 2013, the police took coercive custody of him by indicating there was a problem with his juvenile probation that required him to come to the police station. (3-16-15 p. 56 L. 7-10). The intrusion was not a mere encounter and there was no basis for an investigative detention because there was no issue with the defendant's probation. The questions asked by the detectives did not give the trial court a sound basis for finding that the discovery of the fingerprint on the car was a sufficient basis to arrest appellant for false statements to police where only the affidavit of probable cause was presented to the district court judge which contained a material misrepresentation that appellant said he had never touched the car. (3-16-15 P. 67-69). The officer did not say on direct that she told him he could be arrested for unsworn falsification. (3-16-15 p. 69). There is no memorialization of the defendant being told when he gave the statement that he could be arrested for unsworn falsification, but only that it might have been done as a matter of habit. (3-16-15 P. 68-71).

9. The affidavit of probable cause contained a material misrepresentation—it said appellant denied ever having touched the car p. 155—but those were not the questions asked----The question "did you touch it on the night of the shooting" is different from "did you ever touch it". (p. 157-158). The court's response was to admit defense counsel was correct but that the police are not perfect so they

5

should be given a break not warranted or able to pass constitution scrutiny. (P. 159 L. 1-25); (3-18-15 p. 158, p. 164). The trial court admits the question is vague and is subject to two interpretations. (3-16-15 P. 156 L. 1-25_ —if the question is subject to two interpretations then it is subject to two answers. If it is subject to two answers and the defendant gives one of the answers that it is subject to then the answer is not **false**. The arrest was an illegal arrest therefore and any evidence obtained therefrom should be suppressed..

10. The trial court erred in refusing to strike juror 3 for cause p. 43-52

11. The trial court erred in striking juror number 14 from the jury for a simple possession of marijuana charge. (p. 129)

12. Witness William Matusiak clearly said he did not remember an answer to a question, in which case the trial court should have allowed the defense to refresh his recollection. (3-18-15 P. 38 L. 1-14). Prosecutor Kolansky's objection should have been overruled where he claimed that defense counsel was attempting to impeach the witness. (3-18-15 p. 39). The witness clearly stated he did not remember. 3-18-15 P. 41-42. The error was not harmless beyond a reasonable doubt.

13. Detective Dinnell determined that fingerprint #3 belonged to the defendant Troy Walker on October 29, 2013. (NT 3-18-15 p. 81). The trial court erred in overruling Mr. Cooper's objection to the question that Detective Dinnelli's opinion had a degree of scientific certainty when in fact fingerprint analysis has no degree of scientific certainty.

Moreover, the opinion was not being given by a scientist but by a police officer with no formal scientific training. He was not qualified to give a scientific opinion by any scientific body or approved organization that had done actual experimentation that contained any scientific validity. (NT 3-18-15 p. 83; p. 88).

Finally, the suppression motion should have been granted because the admission of the fingerprint analysis was not harmless error. The evidence of guilt was not overwhelming.

14. The trial court erred in denying the defense motion for extraordinary relief. The jury foreperson hid the fact that he was a counsellor at the institution appellant resided at the time appellant resided there. Appellant's right to engage in choosing a fair jury was prejudicially affected. Appellant was housed at Ranch House and the foreman was stationed at McCreary House. (NT 9-10-15 P. 26 l. 8-10). Appellant was 15 at the time he came in contact with the jury foreman while in placement. During the trial the foreperson admitted to feeling very strongly he was familiar with appellant. He participated in the deliberations and controlled them as the fore person. (9-10-15 p. 14 l. 17-19). At the time he thought he might now appellant from the juvenile placement. (NT 9-10-15 p. 15 L. 24-25). The foreperson knew that such placements were the result of juvenile delinquency.

The defendant was on trial and the foreperson worked with children who commit crimes.

15. The notes of testimony from the sentencing are not yet available and are not yet posted to on-base. Appellant respectfully requests to be granted permission to file a final concise after receipt and review of the notes of testimony from the sentencing.

[sic].

This opinion will address the issues as follows: the jurisdiction of the trial court (issue 2), the motion to suppress (issues 7, 8, and 9), the striking of jury panel members 3 and 14 (issues 10 and 11), the admission of certain evidence into trial (issues 3, 4, 12, and 13), the propriety of statements made by the Commonwealth during closing arguments (issue 6), the sufficiency of the evidence (issues 1 and 5), the motion for extraordinary relief (issue 14), and defendant's sentencing claims (issue 15).

## ANALYSIS

### I. This Court Did Not Err in Failing to Decertify the Case to Juvenile Court (Issue 2).

Defendant complains in his Statement that this Court "erred in failing to decertify appellant back to juvenile court." The issue of certification between the juvenile and criminal divisions is jurisdictional and, therefore, not waivable. *Commonwealth v. Sanders*, 814 A.2d 1248, 1250 (Pa. Super. Ct. 2003) (citation omitted). A trial court's decision to grant decertification will not be overturned absent a gross abuse of discretion. *Id.* Because Defendant failed to petition to decertification, this Court committed no error in retaining jurisdiction over Defendant.

Pursuant to Pennsylvania's Juvenile Act, the prosecution of a juvenile offender who has committed murder or any of offenses excluded from the definition of "delinquent act" in 42 Pa. C.S.A. § 6302 is generally within the jurisdiction of the criminal division of the Court of Common Pleas. *See* 42 Pa. C.S.A. § 6322(a); 42 Pa. C.S.A. § 6302; 42 Pa. C.S.A. § 6355(e). When a case goes directly to the criminal division, the juvenile has the option of petitioning the court for decertification to the juvenile system. *Sanders*, 814 A.2d at 1250; *see also* 42 Pa. C.S.A. § 6322(a), (b); 42 Pa. C.S.A. § 6355(e). Upon a petition to transfer, the juvenile bears the burden "to establish by a preponderance of the evidence that the transfer will serve the public interest." *See* 42 Pa.C.S.A. § 6322(a); 6355(a)(4)(iii) (listing the factors to be considered by the court). If the juvenile fails to present sufficient evidence to establish that he is in need of and amenable to treatment, supervision, or rehabilitation within the juvenile system, the petition must be denied and jurisdiction remains with the criminal division. *Commonwealth v. Johnson*, 669 A.2d 315, 321 (Pa. 1995).

8

In the instant case, although Defendant was seventeen years of age at the time the offense occurred, this Court had original jurisdiction over Defendant because he had been charged with murder. 42 Pa. C.S.A. § 6302. The issue of decertification was not raised by Defendant, before, during, or after trial, but raised for the first time on appeal.[9] Defendant therefore failed to exercise his option of petitioning for decertification and failed to meet his burden of presenting sufficient evidence to this Court to warrant ordering the transfer of Defendant's case to the juvenile system.

## II. Defendant's Motion to Suppress was Rightfully Denied (Issues 7, 8, and 9).

Defendant claims that the statements he made to the police on November 2, 2013, and December 18, 2013, should have been suppressed from admission into evidence at trial. Defendant raised this issue in a pre-trial omnibus motion filed on August 21, 2014, and a suppression hearing was held prior to trial on March 16, 2015. Defendant also challenged this Court's denial of the suppression motion in his post-sentence motion, filed on October 29, 2015.

When a defendant appeals from the denial of a suppression motion, the standard and scope on review is "whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Downey*, 39 A.3d 401, 405 (Pa. Super. Ct. 2012) (quoting *Commonwealth v. Johnson*, 33 A.3d 122, 124 (Pa. Super. Ct. 2011)). An appellate court will only consider "the evidence of the prosecution and so much of

---

[9] In Defendant's Statement, he refers to a "Rule 600 Motion." Defendant filed a first motion pursuant to Rule 600 on June 9, 2014, which was denied on June 19, 2014, and second motion on December 22, 2014, which was withdrawn by Defendant on February 11, 2015. Neither Rule 600 motion addressed the age of Defendant or the jurisdiction of this Court. Defendant also refers in his Statement to the testimony given on the second day of trial, in which one of the investigating officers stated that Defendant was under eighteen at the time of the attempted murder. Trial Tr. 149:19-151:9, March 18, 2015. However, this testimony was given to establish Defendant's age at the time of his questioning by the police, and did not amount to a petition to transfer or a presentation of the factors necessarily contemplated before such a transfer can occur.

the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Id.*

A.    Defendant's First Statement was Not the Result of Custodial Interrogation.

Defendant claims that his first statement, given to the police on November 2, 2013 (and entered into evidence at the suppression hearing as CS-1), was given during an un-Mirandized custodial interrogation, in violation of the Fifth Amendment of the United States Constitution.[10] Defendant's argument fails because Defendant was not in custody at the time he made the statement.

Because the Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself," an individual subjected to custodial interrogation must first be given *Miranda* warnings. U.S. Const. amend. V; *Miranda v. Arizona*, 384 U.S. 436, 444, 478-79 (1966). A person is deemed to be in custody for *Miranda* purposes when "he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation." *Commonwealth v. Baker*, 24 A.3d 1006, 1019 (Pa. Super. Ct. 2011) *aff'd*, 78 A.3d 1044 (Pa. 2013) (citation omitted). Whether an individual could have objectively reasonably believed he was in custody is based on the totality of the circumstances. *See id.* at 1019-20 (listing factors to be considered in determining whether an interrogation is custodial).[11] The age of the defendant is

---

[10] Neither Defendant's Omnibus Pre-Trial motion, oral argument, or post-sentence motion specifically invoke the protections of the Constitution of the Commonwealth of Pennsylvania. Defendant's Pre-trial Omnibus Motion broadly invokes the Fifth, Sixth, and Fourteenth Amendments. The Supreme Court of Pennsylvania has held that Article I, § 9 of the Pennsylvania Constitution "affords no greater protections against self-incrimination than the Fifth Amendment to the United States Constitution." *Commonwealth v. Cooley*, 118 A.3d 370, 375 n.8 (Pa. 2015) (citation omitted).

[11] The factors include "the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions." *Baker*, 24 A.3d at 1019-20 (citation omitted).

10

SCANNED 05/24/2018

one factor to be considered in a Miranda custody analysis. *J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011).

Historically, where a defendant is a juvenile,[12] the juvenile must have the opportunity to consult with an "interested adult" prior to waiving his *Miranda* rights. *Commonwealth v. Hernandez*, 446 A.2d 1268, 1270 (1982). This is no longer a *per se* rule; rather, a totality of the circumstances test is to be used to determine whether a juvenile subjected to custodial interrogation has knowingly, intelligently, and voluntarily waived his rights. *Commonwealth v. Williams*, 475 A.2d 1283, 1288 (Pa. 1984). Factors to be considered in making this determination may include the presence of an interested adult, the manner in which the juvenile was treated by the police, and the juvenile's age, experience, background, intelligence, capacities, and prior record. *Id.*

The constitutional protections against self-incrimination extend to individuals on probation. *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). When a parole or probation interview rises to the level of custodial interrogation, the parolee or probationer must be *Mirandized. Id.* at 429–34. For example, in *Commonwealth v. Cooley*, 118 A.3d 370, 371-72 (Pa. 2015), the parolee's parole officer, acting on a tip, placed the parolee in handcuffs and searched his person upon his arrival at the parole office. The officer then questioned the parolee and informed him that officers were going to search his residence; the parolee admitted that they would find contraband, and officers thereafter conducted a search on his home and his vehicle

---

[12] A juvenile or child is defined by the Juvenile Act as an individual who:
  (1) Is under the age of 18 years;
  (2) Is under the age of 21 years who committed an act of delinquency before reaching the age of 18 years; or
  (3) Is younger than 21 years and was adjudicated dependent before reaching the age of 18 years and who, while engaged in a course of instruction or treatment, requests the court to retain jurisdiction until the course has been completed.
42 Pa. C.S.A. § 6302.

11

(with the handcuffed parolee present). *Id.* at 372. At no point did anyone tell the parolee that he was not under arrest. *Id.* at 379. The Supreme Court of Pennsylvania found that this behavior by law enforcement amounted to more than a mere parole interview, stating "It is difficult to credit any suggestion that appellant, or anyone else, would have felt free to leave here." *Id.*

In contrast, the probationer in *Minnesota v. Murphy* was obligated as part of his probation to report to his probation officer; during a mandatory probation meeting, the officer questioned the probationer about new crimes, to which he confessed. *Murphy*, 465 U.S. at 422-25. The Supreme Court found that the interaction between the officer and probationer during a mandatory probation meeting did not rise to the level of custodial interrogation, as there was no formal arrest or its functional equivalent, and the probationer was free to leave at the end of the meeting. *Id.* at 429-30.

Statements made to probation or parole agents concerning new crimes must be suppressed if such statements were compelled by threat of probation or parole revocation, but only where the threat is explicit. *Commonwealth v. Knoble*, 42 A.3d 976, 982 (Pa. 2012). For example, in *Minnesota v. Murphy*, since the probation officer did not threaten to revoke probation if the probationer left the meeting without answering the officer's questions, and no condition of probation specified that he could not invoking his Fifth Amendment rights, the probationer did not need be *Mirandized. Murphy*, 465 U.S. at 433-36; *accord Cooley*, 118 A.3d at 379 n.11; *see also Knoble*, 42 A.3d at 982 (finding no custodial interrogation where nothing in the record suggested probationer's probation would have been revoked if he had raised his Fifth Amendment privilege).

Generally, law enforcement may use deception to elicit a statement, provided that the deception does not pertain to the consent itself. *Commonwealth v. L.N.*, 787 A.2d 1064, 1068

12

(Pa. Super. Ct. 2001) (finding statement was voluntary where appellant was tricked into going to station for questioning on another issue because he was informed of the real inquiry prior to giving a statement and was free to leave at any time). An otherwise voluntary confession will not be rendered inadmissible "where the deception does not produce an untrustworthy confession or offend basic notions of fairness." *Commonwealth. v. Williams*, 640 A.2d 1251, 1259 (Pa. 1994) (citation omitted).

In the instant case, the totality of the circumstances indicates that Defendant was not in custody at the time he made his first statement. At the suppression hearing, Detective Kathleen Kelly and Detective James Carbo testified that on the morning of November 2, 2013, the day after Defendant turned eighteen years of age, Defendant became a suspect in the crimes for which he was later charged and convicted. The officers drove around the area to look for Defendant, and found him on the side of the street with his bicycle around noon. Supression Hr'g Tr. 45:2-3, March 16, 2015. They parked the police car and spoke with Defendant, who agreed to come back to the station to speak to them, and who secured his bicycle behind a nearby breezeway. *Id.* at 24:9-14. Defendant called his mother on his cell phone before willingly getting in the back of the police car. *Id.* at 110:24-111:4. When the officers questioned Defendant at the station, he was sitting three feet from the door, and the door was open. *Id.* at 24:25-25:2, 25:13-14. On the first page of the written statement given that day, Defendant acknowledged that he was giving the statement voluntarily, that no threats were made to him, that he was not under arrest, and that he could leave any time he wished. Defendant remained at the station from 11:45 a.m. until 12:58 p.m., when the statement was completed and Defendant walked out.

The facts of the instant case that are to be considered when determining the issue of custody align closer with those of *Cooley* than *Murphy*. *See Murphy*, 465 U.S. at 429-36 (finding

13

that questioning a probationer about a new crime was not custodial where there was no show of force and no threat of revoking probation); *Cooley*, 118 A.3d at 372-79 (holding that handcuffing probationer and questioning him about a new crime was custodial interrogation). No physical detention occurred, and no restraints were used on Defendant. There was no excessive show of police force. Defendant was taken to a station within walking distance from where the officers had found him. The entire interaction lasted not much more than an hour, and Defendant was informed that he was free to leave at any time. The statement was therefore voluntary and not the result of an un-Mirandized custodial interrogation and this Court did not err in determining that the statement should not be suppressed.

Defendant's youth does not negate the voluntariness of his statement. Defendant's experience and background with the juvenile justice system and the civil manner in which he was treated by the police indicate that Defendant was not compelled to give a sworn statement. Furthermore, at the time of his statement, Defendant was no longer a juvenile within the meaning of the act; even if he had been a juvenile, he would not be presumptively entitled to the presence of an interested adult by law. *Williams*, 475 A.2d at 1288.

While the probation officers used a certain level of deception to obtain Defendant's presence in the station, this does not contradict that Defendant was not in custody at the time he gave the statement, or that he gave it voluntarily. At the suppression hearing, both officers candidly testified that although they brought Defendant in for questioning because he was a prime suspect in the crime with which he was later charged, when they initially approached Defendant on the street they informed him only that they wanted him to come to the station to process his release from juvenile probation.[13] However, the officers did not threaten to revoke

---

[13] Defense counsel asked, "So the statement you gave him about coming off of juvenile probation and you wanted to take him down to the police station to see about him getting released is untrue, fair?," to which the detective

14

Defendant's probation if he refused to come in, or if he left the interview without answering their questions. To the contrary, Detective Carbo testified that neither promises nor threats were made to Defendant. Suppression Hr'g Tr. 135:3-7, March 16, 2015. By the time Defendant made the statement, he was fully aware of both the real reason he was being questioned and of his right to leave. While this was a somewhat unseemly tactic used on a barely eighteen-year-old boy, the totality of the circumstances indicates that he could not have reasonably believed he was not physically free to leave the interview. *See Knoble,* 42 A.3d at 982 (finding no custodial interrogation where nothing in the record suggested probationer's probation would have been revoked if he had raised his Fifth Amendment privilege); *L.N.,* 787 A.2d at 1068 (stating that police deception during interrogation must be collateral to the issue of consent itself).

B.      Defendant's Second Statement was Not the Fruit of an Illegal Arrest.

Defendant claims that his second statement should have been suppressed because it was the result of an illegal arrest. Defendant gave his second statement on December 18, 2013, after being arrested pursuant to a warrant charging Defendant with Unsworn Falsification to Authorities.[14] This Court disagrees that Defendant's arrest was unsupported by probable cause.

Pursuant to the Fourth Amendment of the United States Constitution (applicable to the states by the Fourteenth Amendment) and Article 1, Section 8 of the Constitution of the Commonwealth of Pennsylvania, no arrest warrant shall issue without probable cause. *See, e.g., Commonwealth v. Blakney,* 396 A.2d 5, 7 (Pa. Super. Ct. 1978) (applying the Fourth Amendment to an arrest warrant).[15] Probable cause has been defined as, "those facts and

---

answered "Yes." Suppression Hr'g Tr. 47:25-48:5, March 16, 2015. Defense counsel again asked, "Did you reveal anything about fingerprints?" and "Did you reveal anything about him being a suspect in the shooting?" *Id.* at 57:7-11. Both questions were answered by the detective in the negative. *Id.*

[14] 18 Pa. C.S.A. § 4904(a)(1).

[15] Defendant did not specifically invoke the Fourth Amendment or Article 1, Section 8, in his written motion, oral argument, or post-sentence motion.

circumstances available at the time of the arrest which would justify a reasonable prudent man in the belief that a crime has been committed and that the individual arrested was the probable perpetrator." *Commonwealth v. Harper*, 403 A.2d 536, 542 (Pa. 1979) (citations omitted). In determining whether probable cause to arrest exists, the totality of circumstances must be taken into account. *Commonwealth v. Williams*, 2 A.3d 611, 616 (Pa. Super. Ct. 2010). "It is only the probability, and not a *prima facie* showing of criminal activity, that is the standard of probable cause." *Blakney*, 396 A.2d at 7 (citing *Commonwealth v. Murray*, 263 A.2d 886 (Pa. 1970)).

Only the information contained within the four corners of the affidavit is to be examined when determining whether the issuance of the warrant was supported by probable cause. *Commonwealth v. Taylor*, 850 A.2d 684, 686-87 (Pa. Super. Ct. 2004) (citation omitted); *see also* Pa. R. Crim. P. 513(D) ("At any hearing on a motion challenging an arrest warrant, no evidence shall be admissible to establish probable cause for the arrest warrant other than the affidavits provided for in paragraph (a)."). The information contained within the affidavit must be viewed in "a common sense, nontechnical, ungrudging and positive manner," and the question on appeal is whether the signing magistrate "had a substantial basis for concluding that probable cause exists." *Taylor*, 850 A.2d at 686-87 (citation omitted).

A false statement within an affidavit may invalidate an arrest warrant. *Id.* at 687. When the defendant challenges the warrant on the basis of false statements within the affidavit, the defendant bears the burden to show that "(1) a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the affidavit, and (2) the allegedly false statement was necessary to the finding of probable cause." *Id.* at 687 n.3 (citing *Wagner v. Waitlevertch*, 774 A.2d 1247, 1253 (Pa. Super. Ct. 2001)); *see also Commonwealth v.*

16

*Baker*, 24 A.3d 1006, 1018 n.10 (Pa. Super. Ct. 2011) (determining that an immaterial misstatement in an affidavit did not invalidate a warrant), *aff'd*, 78 A.3d 1044 (Pa. 2013).

In the instant case, Defendant was arrested on December 18, 2013, pursuant to a warrant signed by Magisterial District Judge Margaret A. Hunsicker on November 5, 2013.[16] The complaint charged Defendant with Unsworn Falsification to Authorities.[17] The affidavit described the police investigation of the shooting, including the injuries sustained by the complaining witness, and the reports by the eye-witnesses to the incident. It related that after the shooting, the vehicle belonging to the complaining witness had been driven away by the perpetrator, who had crashed it into a police car that was just arriving on the scene, and who had then abandoned it in an adjacent lot. The affidavit stated that four latent fingerprints had been lifted from the vehicle and submitted to a database, and that one of the prints was found to match the fingerprint of Defendant. Furthermore, the affidavit established that the perpetrator was described as a black male and that the offense occurred in the parking lot of Defendant's last known address. Finally, it stated that Defendant had provided a written and signed statement on November 2, 2013, in which he "denied ever touching or driving the [complaining witness's vehicle]" despite having recognized it during the interview from its prior posting on a local online news source.

Based on the totality of the circumstances, the affidavit contains a substantial basis for concluding that there was probable cause that Defendant had committed Unsworn Falsification to Authorities. The definition of the offense provides that a person commits the offense "if, with intent to mislead a public servant in performing his official function, he . . . makes any written false statement which he does not believe to be true." 18 Pa. C.S.A. § 4904(a)(1). The

---

[16] The criminal complaint and affidavit were entered into evidence as CS-2.
[17] 18 Pa. C.S.A. § 4904(a)(1).

17

magistrate, being informed in the affidavit that Defendant's prints had been found on the vehicle, but that he had made a signed statement to the police that he had "denied ever touching" the vehicle, would have been reasonable to conclude that Defendant's statement was probably false, that he did not believe his statement to be true, and that he had made it with the intent to mislead the officers investigating the crime.

Defendant asserts that the affidavit contains a materially false statement, and therefore the resulting arrest warrant was invalid. The affidavit conveys that in Defendant's written statement of November 2, 2013, "he denied *ever* touching or driving the [complaining witness's vehicle]" (emphasis added) and that he told detectives "he had viewed of photo of the victim's [vehicle] posted on the 'Norristown Patch' and denied *ever* touching that specific vehicle" (emphasis added). CS-2, at 3.

For Defendant's claim to succeed, the inclusion of this language in the affidavit must amount to (1) a false statement made knowingly and intentionally, or with reckless disregard for the truth, and (2) have been necessary to the finding of probable cause. *Taylor*, 850 A.2d at 686-87. The standard for recklessness is as follows:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa. C.S.A. § 302(b)(3). While the undersigned acknowledges that this portion of the affidavit was material to the finding of probable cause for the charge of Unsworn Falsification, for the reasons that follow, these statements do not rise to the level of false statements made with reckless disregard for the truth, and therefore the arrest warrant was valid.

18

During the course of the interview on November 2, 2013, Defendant responded to the following questions:

Q: Did you drive a Blue Colored Volkswagen on Sunday, October 20, 2013 at approximately 2:45 AM?
A: No, I was asleep at my dads house

Q: Were you ever inside of a Blue colored Volkswagen on Sunday, October 20, 2013 at approximately 2:45 AM?
A: No, I was asleep at my dads house.

Q: Do you remember if you touched any Blue Volkswagen Passats on Saturday, October 19 or Sunday, October 20, 2013?
A: No, I didn't touch any Blue Volkswagen Passats on either of those days.

Q: Do you know what a Volkswagen Passat looks like?
A: Yes because I saw a picture of it on the Norristown Patch. I saw a picture of the car that was involved in the shooting because it was attached to the article about the shooting at the Riverside Apartments.

Q: Did you drive the Volkswagen that you saw the picture of on the Norristown Patch that was involved in the shooting at the Riverside Apartment in Norristown on Sunday, October 20, 2013?
A: No, I did not.

Q: Did you touch the Volkswagen that you saw the picture of on the Norristown Patch that was involved in the shooting at the Riverside Apartments in Norristown on Sunday, October 20, 2013?
A: No, I did not.

[sic]. CS-1, at 2.

While the affiant did not transcribe verbatim Defendant's statements into the affidavit of probable cause, her interpretation of Defendant's statements was neither patently false nor did it amount to a gross deviation from reasonable conduct, particularly at the probable cause level. The first three questions listed above are clearly asking Defendant about his actions on October 19, 2013, and October 20, 2013. The rhythm is broken by the next question, in which Defendant admits to knowing what the car in question looks like from having seen it on a local news site. The last two questions, which ask "Did you drive [or touch] the Volkswagen that you saw the

19

picture of on the Norristown Patch that was involved in the shooting at the Riverside Apartment in Norristown on Sunday, October 20, 2013?" can be interpreted in two ways:

(1) "Did you [ever] drive or touch the vehicle . . . (that was involved in the shooting . . . on Sunday, October 20, 2013?)," and

(2) "Did you drive or touch the vehicle . . . (that was involved in the shooting) . . . on Sunday, October 20, 2013?"

Because Defendant had just finished answering, in the previous question, that he was familiar with the vehicle that was involved in the shooting at the Riverside Apartment, it's reasonable to assume that the date given (October 20, 2013) was contributing to the overall description of the vehicle, rather than describing Defendant's actions, and that the above question (1) was asked and answered. Although the word "ever" was not included in the statement, but was included in the affidavit, common sense makes it implicit in the question.[18]

Furthermore, Defendant had been asked earlier in the statement "Do you remember if you touched any Blue Volkswagen Passats on Saturday, October 19 or Sunday October 20, 2013?" to which Defendant replied "No, I didn't touch any Blue Volkswagen Passats on either of those days." When the officer later asked if Defendant had touched the vehicle involved in the shooting on October 20, 2013, after having established that it was a blue Volkswagen Passat, he must have been referring to a greater time period than the single day, or his question would have been redundant. While the existence of two interpretations to the question arguably meant that there was insufficient evidence at the time for a conviction of unsworn falsification at the "beyond a reasonable doubt" standard, the totality of the circumstances, including the common-

---

[18] For example, the question "Did you ride the bicycle your aunt bought you on your birthday?" implies a query of whether the answerer has *ever* ridden that particular bicycle.

20

sense interpretation of the question (and Defendant's negative answer), provides ample probable cause for arrest on that charge.

Defendant further complains that there was not sufficient probable cause to arrest Defendant on the charge of Unsworn Falsification to Authorities because Defendant had not received notice when making the statement that he could be charged with this crime. However, unlike a violation of § 4904(b) ("Statements 'Under Penalty'"), a violation of § 4904(a)(1) does not require that the false statement be made "on or pursuant to a form bearing notice, authorized by law, to the effect that false statements made therein are punishable." 18 Pa. C.S.A. § 4904. Additionally, Detective Kelly testified that she orally warned Defendant that a false statement would be punishable. Suppression Hr'g Tr. 69:3-71:17, March 16, 2015.

### III. This Court Did Not Err When Deciding Whether to Strike Jury Panel Members 3 and 14 for Cause (Issues 10 and 11).

Defendant complains that this Court erred in denying Defendant's motion to strike potential juror number 3 for cause, and in striking potential juror number 14 for cause. The exclusion of jurors is within the sound discretion of the trial court. *Commonwealth v. Baumhammers*, 92 A.3d 708, 740 (Pa. 2014) (citation omitted). Great deference is given the trial judge, who "not only hears the questions and answers during *voir dire*, but also observes the demeanor of the veniremen and assesses their credibility and ability to be impartial." *Commonwealth v. Smith*, 540 A.2d 246, 256 (Pa. 1988). The party seeking to remove a prospective juror for cause has the burden of establishing the reason for the removal. *Id.* A trial court's determination on a motion to strike for cause will not be reversed in the absence of palpable error. *Id.* at 257.

21

The purpose of examining jurors under *voir dire* is to secure a competent, fair, impartial, and unbiased jury. *Smith*, 540 A.2d at 257. A challenge for cause may be based on a demonstration that the juror possesses a fixed, unalterable opinion that would prevent the juror from rendering a verdict based solely on the evidence and the law. *Id.* at 256. The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence. *Commonwealth v. Wilson*, 672 A.2d 293, 299 (Pa. 1996). A trial court's review of a challenge for cause "is not a wide-ranging inquiry into a potential juror's personal beliefs and moral standards but rather is a focused probe into that juror's ability to render a verdict that is 'fair, just, and in accordance with the testimony presented.'" *DiFeliceantonio v. Armstrong World Industries, Inc.*, 680 A.2d 893 (Pa. Super. Ct. 1996) (quoting *Commonwealth v. Johnson*, 305 A.2d 5, 8 (Pa. 1973)).

A.      This Court did not Err in Denying the Motion to Strike Potential Juror Number 3 for Cause.

Defendant moved to have juror number 3 stricken from the jury panel due to her relationships to family members active in law enforcement.[19] Trial Tr. 51:3-52:10, March 17, 2015. Because she did not exhibit bias towards the Commonwealth, this Court did not err in denying the motion to strike the potential juror for cause.

The relationship between a prospective juror and law enforcement may at times necessitate a presumption of prejudice. A prospective juror who is a law enforcement officer with any "real relationship" to the case, such as where the officer is a member of the same force as witnesses in the case, should be disqualified for cause. *Commonwealth v. Jones*, 383 A.2d 874, 876-77 (Pa. 1978); *see, e.g., Commonwealth v. Kelly*, 2016 PA Super 26 (Pa. Super. Ct.

---

[19] Defendant did not argue that prospective juror number 3 should be stricken for cause on any other grounds.

Feb. 8, 2016) (finding that a real relationship with the case existed where the juror was a police officer in the same county, filed cases with the same District Attorney's Office, had worked with two of the prosecutors, and personally knew several of the law enforcement witnesses); *Commonwealth v. Dye*, 765 A.2d 1123 (Pa. Super. Ct. 2000) (finding that a new trial was warranted where, despite potential juror testifying that she believed she could decide the issues of the case fairly, her husband was the supervisor of the police officer that testified for the Commonwealth at trial); *c.f. Commonwealth v. Stamm*, 429 A.2d 4 (Pa. Super. Ct. 1981) (holding that where jurors were related to the police prosecutor and a member of the district attorney's staff, but there was no record of the degree of the relationship, there was no basis to strike for cause). Where there is no real relationship to the case, the removal of an enforcement officer should depend on the sound exercise of discretion by the trial judge. *Jones*, 383 A.2d at 877.

Similarly, potential jurors who admit to bias in favor of law enforcement should be stricken for cause. For example, where a juror stated that the prosecuting police officer was his best friend, and that he would therefore find his testimony credible, the challenge against him should have been sustained. *Commonwealth v. Perry*, 657 A.2d 989 (Pa. Super. Ct. 1995). Even a juror who later states that she can follow the court's instructions and render a "fair and impartial" verdict and that the issue "comes down to the evidence" should be stricken for cause where her initial answers on the juror questionnaire and during *voir dire* unequivocally indicated that she would be more likely to believe the testimony of a police officer, and where she had prior work experience in security and law enforcement and where her boyfriend was a police officer. *Commonwealth v. Penn*, 2016 PA Super 19 (Pa. Super. Ct. Feb. 1, 2016).

In the instant case, the potential juror stated that she has some ties with law enforcement. Her son is a police officer, her daughter is a 9-1-1 dispatcher and special officer, two of her cousins served as state troopers, and a few of her uncles were police officers. Trial Tr. 43:15-23, March 17, 2015. She responded to the collective questioning by raising her card to the question of whether her connections would prejudice her ability to be fair. However, she responded to individual questioning as follows:

> Q. Would that fact that you have those relatives or acquaintances in law enforcement, would that affect you from being biased or sympathetic to one end or the other.
> A. I would like to say no. . . . I want to say I would be fine with it and could make the decision. I know that sounds wishy-washy. . . I like to judge people for who and what they are. I'm not going to say you're a police officer, I'm going to believe a hundred percent. Am I going to lean, maybe? But I'm going to hear what he has to say first. . . . I don't think because they have a uniform that they are a hundred percent right, no. I do not believe that.

Trial Tr. 44:2-45:2, March 17, 2015. And then:

> Q. So the question really is are you going to – if you don't believe a police officer, is the fact that they're a police officer going to cloud your judgement as to whether to believe them or not?
> A. I'm not really sure.
> Q. Does that make sense?
> A. No, it doesn't.

*Id.* at 47:9-15. And then:

> Q. . . . [A]re you concerned as to whether you can be [fair] or not if you're chosen and it comes time to deliberate after you hear the testimony, to feel like your prior relationship is going to interfere with your ability to judge?
> A. I don't think it would. I mean, I guess I would have to be in the middle in that situation.
> Q. You don't know until you get there?
> A. Right. I would think that I would do it fairly and weigh both sides evenly and not because one is in a uniform and one isn't. . . . I really don't have a complete one hundred percent this is exactly how I'm going to answer it until I hear both sides.

*Id.* at 47:25-48:16.

24

Potential juror number 3 did not display the ties with law enforcement that would amount to a "real connection" to the case, nor did she exhibit any bias on behalf of the Commonwealth that would warrant her removal. None of the law enforcement jurisdictions with which she has a connection were involved in the instant case. While she raised her card in response to bias in favor of law enforcement, on direct questioning she stated initially and repeatedly that she would not categorically credit a police officer over the words of another solely by virtue of their profession. These answers are not like the answers by the potential juror in *Penn*, who answered in the strict affirmative several times that her natural instinct was to believe a police officer.[20] *Penn*, 2016 PA Super at *1-2, *6. Rather, juror number three portrayed the quintessential open-mindedness the Court desires in a juror. Accordingly, this Court did not palpably abuse its discretion in denying to strike potential juror number 3 for cause.

B.    This Court did not Err in Striking Potential Juror Number 14 for Cause.

Defendant complains in his Statement that this Court erred in striking juror number 14 "for a simple possession of marijuana charge." Defendant's complaint is frivolous for two reasons.

First, Defendant waived his claim by failing to object to this Court's ruling. Pursuant to Rule 631 of the Pennsylvania Rules of Criminal Procedure, challenges for cause shall be exercised orally as soon as the cause is determined. Pa. R. Crim. P. 631(c). Here, the Commonwealth made a timely assertion that the potential juror was ineligible to serve, and rather than object to the challenge, Defense counsel simultaneously agreed with Commonwealth that Defendant was not eligible to serve. Trail Tr. 129:18-20, March 17, 2015. The claim was therefore waived. *See Commonwealth v. Kaminski*, 502 A.2d 1281, 1285 (Pa. Super. Ct. 1985);

---

[20] It should be noted that *Penn* was not law at the time of the instant case.

25

Pa. R. A. P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Second, the Commonwealth was correct that potential juror number 14 was ineligible to serve based on his prior convictions. Every Pennsylvanian who is eighteen years or older is eligible to serve as a juror in the county in which they live. 42 Pa. C.S.A. § 4502(a). However, an otherwise qualified potential juror is ineligible to serve if he or she "has been convicted of a crime punishable by imprisonment for more than one year and has not been granted a pardon or amnesty therefor." 42 Pa. C.S.A. § 4502(a)(3).

Here, the potential juror stated that had two prior convictions under the Drug Act, including possession of a controlled substance (marijuana) and possession of drug paraphernalia. Trial Tr. 81:14-82:8, 84:23-85:9, March 17, 2015. After obtaining documentation of his criminal record, the prosecutor stated that the potential juror had been sentenced for a crime with an exposure for a maximum sentence of three years. *Id.* at 129:3-20. Defense counsel agreed that the exposure was more than year "because of prior possessions." *Id.* at 13-14; *see* 35 P.S. § 780-113(b) (providing that a second violation under certain sections of the drug act qualifies for a sentence of imprisonment up to three years). Therefore, potential juror number fourteen was disqualified pursuant to 42 Pa. C.S.A. § 4502(a)(3).

## IV. This Court Did Not Err in Admitting Certain Evidence Into Trial (Issues 3, 4, 12, and 13).

Defendant makes several complaints regard the admissibility of trial evidence. Rulings on the admissibility of evidence are committed to the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of that discretion. *Commonwealth v. Koehler*, 737 A.2d 225, 237 (Pa. 1999).

26

A.    The Commonwealth's Leading Question was not Reversible Error.

Defendant complains that this Court erred in overruling his objection during the direct examinations of Detective Kelly and Detective Carbo. Defendant asserts that the questions posed by the Commonwealth were leading and conclusory.

Rule 611 governs the manner in which witnesses may be questioned, and mandates that leading questions should only be allowed on cross examination or direct examination of a hostile witness. Pa. R. E. 611(c). A leading question is one which is framed so as to indicate or suggest the desired answer "by putting words in the witness's mouth." *Commonwealth v. Stultz*, 114 A.3d 865, 882 (Pa. Super. Ct. 2015) *appeal denied*, 125 A.3d 1201 (Pa. 2015). The fact that a question calls for a "yes" or "no" answer does not necessarily make it leading. *Commonwealth v. Reed*, 990 A.2d 1158, 1170 (Pa. 2010). A court should exercise reasonable control over the examination of witnesses so as to: "(1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Pa. R. E. 611(a). The rule against leading questions "is to be liberally construed, with a large measure of discretion in the court to permit parties to elicit any material truth without regard to the technical considerations of who called the witness." *Commonwealth v. Chambers*, 599 A.2d 630 (Pa. 1991). The defendant is not entitled to reversal except where the trial court has clearly abused its discretion in tolerating leading questions. *Commonwealth v. Chmiel*, 777 A.2d 459 (Pa. Super. Ct. 2001).

The Commonwealth elicited testimony from Detective Kelly regarding Mr. Baptiste. The detective testified on direct examination that when she arrived at the scene of the crime, she ran a check on the license plate of the car in the spot that was adjacent to where the shooting had occurred. The detective determined that the car was registered to Ronald G. Baptiste, who lived

27

in the adjacent apartment complex, and with whom the police then made contact. Trial Tr. 112:21-114:12, March 18, 2015. Detective Kelly testified about the rest of the investigation into Baptiste, including the search of his vehicle *Id.* at 115:16-116:25, 142:17-149:15, 160:16-163:7. When the Commonwealth asked the witness, "Did you recover anything in your investigation that indicated Mr. Baptiste was involved in this shooting?" Defendant objected. *Id.* at 161:5-11. 162:4-10. This Court instructed that the witness was not to offer a conclusion as to whether or not Baptiste was involved in the crime, but could offer whether any evidence recovered during the course of her investigation indicated his involvement.[21] *Id.* at 162:11-163:4.

On cross examination, defense counsel established that the officer who had seen Defendant's flight was shown a picture of Baptiste and had responded "That looks like the guy who was driving the car that hit me." Trial Tr. 147:23-24, March 18, 2015. Defense counsel also established that a gun was recovered from Baptiste's vehicle. *Id.* at 149:6-15.

The Commonwealth also questioned Detective Carbo about the investigation of Mr. Baptiste and the gun that was recovered from his vehicle. *Id.* at 226:18-227:14. Defendant objected to the Commonwealths' question "Again, just directed to your investigation, your involvement, did you find any evidence to indicate Mr. Baptiste was involved in this shooting?" *Id.* at 226:24-227:2. Defendants objection was overruled.

The Court did not abuse it's discretion by allowing the question. While the question may have started with "Did you ever recover anything . . . ," and was therefore a "yes" or "no," question, it was not so suggestive of an answer as to put words in the detectives' mouths.[22] It's possible that the question could have been asked in a more open-ended manner. On the other

---

[21] The Court rephrased the question as, "I'm asking [you whether you have] firsthand knowledge based on your investigation, can you say based on your investigation, whether you have any information that he was involved." Trial Tr. 162:22-25, March 18, 2015.

[22] For example, the question was not "You didn't ever recover any evidence that suggested Mr. Baptiste's involvement, did you?"

28

hand, it's possible that the aggregated question could have been asked in a long series of non-leading questions, which would have been a waste of time. *See* Pa. R.E. 611(a) (stating that the examination of witnesses should aim at eliciting truth and not wasting time). Furthermore, just as the Commonwealth's witness was able to testify about the totality of evidence they recovered pointing to Mr. Baptiste as a subject, Defense counsel was able to cross-examine the witnesses as to that evidence and whatever investigations the police should have conducted or any leads that they failed to pursue, minimizing any prejudice caused to Defendant. This Court therefore did not abuse its discretion in permitting the question.

B.      Defendant was Permitted to Refresh the Witness's Recollection.

Defendant complains that this Court erred in sustaining the prosecutor's objection to the defense counsel's attempt to use a document to refresh the recollection of a Commonwealth witness. During cross examination of the Commonwealth's witness, defense counsel posed questions about what the witness had stated to the police on the night of the incident. Trial Tr. 38:8-14, March 18, 2015. Defense counsel attempted to show the witness the statement that he had made to the police. *Id.* at 38:15-17. The Commonwealth objected to the use of the document, claiming it was an improper procedure by which to impeach the witness. *Id.* at 39:4-42:9. Defense counsel maintained that the document was to be used to refresh recollection, rather than for impeachment purposes. *Id.*

Defendant's claim is without merit. This Court overruled the Commonwealth's objection and allowed defense counsel to use the document to refresh the witness's recollection. Trial Tr. 42:17-43:6, March 18, 2015.

29

C.   This Court did Not Err in Permitting the Testimony of the Cell Phone Expert.

Defendant complains that this Court should not have allowed the prosecution's witness to testify as an expert on cell phone records analysis, or to testify that he could determine the location of Defendant's cell phone using the records of surrounding cell phone towers. The undersigned disagrees.

Experts may testify to their opinions only when qualified by their knowledge, skill, experience, training, and education and when their testimony encompasses scientific, technical, or other specialized knowledge that is beyond that possessed by the average layperson, and where their methodology is generally accepted in the relevant field. Pa. R. E. 701. Conversely, lay witnesses may testify only to unscientific knowledge that is rationally based on their personal perception. Pa. R. E. 702.

The proponent of expert scientific evidence bears the burden of establishing all of the elements for its admission under Pa. R.E. 702 pursuant to the standard in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). *Commonwealth v. Freeman*, 128 A.3d 1231, 1246 (Pa. Super. Ct. 2015).

> It is well established in Pennsylvania that the standard for qualification of an expert is a liberal one and the test to be applied is whether the witness has a reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight of that testimony is for the trier of fact to determine. It is also well established that an expert may render an opinion based on training and experience; formal education on the subject matter is not required.

*Commonwealth v. Baez*, 720 A.2d 711, 727 (Pa. 1998). "A *Frye* hearing is warranted when a trial judge has articulable grounds to believe that an expert witness has not applied accepted scientific methodology in a conventional fashion in reaching his or her conclusions." *Freeman*, 128 A.3d at 1246. Where a *Frye* hearing has not been requested, objection to the underlying methodology

30

used by the expert witness has been waived. *Commonwealth v. Latham*, 2702 EDA 2010, 2014 WL 10979805, at *2-3 (Pa. Super. Ct. Mar. 17, 2014).

Testimony whereby a witness analyzes cell phone records to determine a cell phone's location in relation to a cell tower does not require specialized knowledge requiring a qualified expert pursuant to Rule 702. *See Commonwealth v. Watson*, 900 MDA 2013, 2014 WL 10803077, at *4 (Pa. Super. Ct. Aug. 11, 2014) (ruling that the Commonwealth's use of cellphone tower "ping" evidence to establish the location of a defendant's cellphone was admissible as a lay opinion); *Commonwealth v. Siple*, 275 EDA 2013, 2014 WL 10917672, at *3 (Pa. Super. Ct. June 19, 2014) (finding that where a detective had worked with cellphone records twenty to thirty times and had sufficiently explained that cell phones connect with the nearest provider-specific cell tower, his testimony regarding the closest cell tower to where the defendant's cell phone had made a call was permissible as lay testimony).[23]

Analysis of cell tower data to generalize the location of a cell phone has also been upheld as admissible as an expert opinion. *See Commonwealth v. Latham*, 2702 EDA 2010, 2014 WL 10979805, at *2-3 (Pa. Super. Ct. Mar. 17, 2014) (upholding the recognition of a special agent as an expert in historical cell site analysis where the agent testified that he had been utilizing such techniques for ten years, had received specialized training in the area, provides similar training to law enforcement, and had extensive experience working with commercial cellular telephone carriers); *accord Commonwealth v. Page*, 2625 EDA 2010, 2014 WL 10965747, at *2 (Pa. Super. Ct. Mar. 7, 2014). This is so even where the Commonwealth failed to provide the underlying data, analytical process or method, and scientific bases relied on by the expert in forming his opinions. *Latham*, 2702 EDA 2010, 2014 WL 10979805, at *2-3.

---

[23] For further explanation of such analysis, see *Commonwealth v. Barnhill*, 1901 MDA 2013, 2014 WL 10889906, at *6 n.4 (Pa. Super. Ct. Aug. 14, 2014) (in considering a right to privacy claim, explaining how 'pinging' is used to determine the real time location of a cell phone using the signal between the cell phone and the closest cell tower).

31

Defendant's claim fails for several reasons. First, Defendant failed to properly object to the underlying scientific methodology used by the witness by requesting a *Frye* hearing. While Defendant objected to the expert's testimony at trial, Defendant specifically stated that he did not object to the expert's qualifications but claimed that an "insufficient foundation" had been laid for his opinion because "no one" could make a determination on the general vicinity of a cell phone using the data on which the witness was relying.[24] Trial Tr. 169-174:12, March 18, 2015. Defendant did not assert any grounds to suggest that historic cell site analysis is in some way flawed or that the expert failed to apply the accepted scientific methodology in reaching his conclusions. Defendant did not request a *Frye* hearing, and this Court had no articulable grounds to believe that a *Frye* hearing was warranted. *Freeman*, 128 A.3d at 1246. Therefore, his claim has been waived. *Latham*, 2702 EDA 2010, 2014 WL 10979805, at *2-3.

Second, the Commonwealth's witness was rightfully qualified as an expert. The witness was a homicide unit detective with more than eighteen years of experience in law enforcement, who testified during *voir dire* that his professional responsibilities include the use of investigative techniques related to cellular telephone technology, such as historical cell site data analysis. Trial Tr. 166-68, March 18, 2015. He has received training in "call detail record analysis, cell phone and cell tower mapping, as well as data extraction from actual cell phones with modular devices." *Id.* He is also certified under the Pennsylvania State Police in wiretap and electronic surveillance. *Id.* His certification training included cell phone records and cell mapping analysis. *Id.* Furthermore, he has personally conducted cell phone mapping analysis between twenty to thirty times, and has assisted investigations in other municipalities. Trial Tr. 173, March 18, 2015. The undersigned found that the witness had adequately established his

---

[24] Defense counsel stated "Judge, I'm not questioning this man regarding his experience, I am questioning with regards to the opinion that they're going to try to elicit to him. I object to that." Trial Tr. 174:8-12, March 18, 2015. Defendant also specifically waived his right to *voir dire* the witness. *Id.* at 174:13-18.

32

expertise to testify pursuant to Rule 702. *Commonwealth v. Latham*, 2702 EDA 2010, 2014 WL 10979805, at *2-3 (Pa. Super. Ct. Mar. 17, 2014).

Third, regardless of the expert's qualifications, the testimony given by the witness was not so technical that it would not have also been admissible as a lay opinion. The witness explained at length the relatively straightforward process by which cell mapping works. Trial Tr. 168:15-169:5, 172:4-173:5, March 18, 2015; Trial Tr. 7:23-17:9, March 19, 2015. Detective Mitchell's testimony "simply correlated phone calls with the nearest tower based on the information provided in Appellant's phone records." *Commonwealth v. Siple*, 275 EDA 2013, 2014 WL 10917672, at *3. Therefore, the testimony would have been admissible even if the witness was not offered as an expert.

Ultimately, the witness only testified to the general location of the cell phone at the time the calls were made, and not to Defendant's exact location.[25] Trial Tr. 25:4-10, 29:19-23, March 19, 2015. He explicitly a testified that an analyst—whether him or someone else—would not be able to determine the exact location using the cell tower data alone. *Id.* at 24:8-17. On cross examination, the witness admitted that he could not determine the outer area of the vicinity. *Id.* at 29:24-30:7. He also stated that he could not determine whether or not Defendant was the person in possession of the cell phone during the time of the crime. *Id.* at 27:21-23. Therefore, the evidence presented by the witnesses was squarely situated to be allotted its appropriate weight by the jury and no prejudice to Defendant was caused by the admission of this testimony.

---

[25] According to the phone records, a call from Defendant's cell phone was made on October 20, 2013, at 2:15 a.m., which lasted more than 11 minutes. Trial Tr. 12, 16, March 19, 2015. That phone call pinged off the cell tower located in Bridgeport, Pennsylvania, which is in the same vicinity as the crime scene. *Id.* at 16-17. The 9-1-1 call reporting shots were fired in the instant crime was placed at 2:46 a.m. *Id.* at 9.

33

Given Defendant's vigorous cross examination of the expert, the expert's adequate qualifications, the simplistic nature of his conclusions, and Defendant's failure to request a *Frye* hearing regarding the use of cell phone analysis, Defendant's claim on appeal is devoid of merit.

D.   This Court did Not Err in Permitting the Testimony of the Fingerprint Expert.

Defendant complains that the Court erred in admitting the testimony surrounding the analysis of Defendant's fingerprint. The expert witness was asked whether he had reached his opinion to a degree of scientific certainty, and Defense counsel objected. Trial Tr. 82:13-83:6, March 18, 2015. In his Statement, Defendant clarifies that he objected because "fingerprint analysis has no degree of scientific certainty."

Defendant also complains in his statement that the witness was improperly qualified as a witness because he was "a police officer with no formal scientific training" and he was not qualified "by any scientific body or approved organization that had done actual experimentation that contained any scientific validity."[26]

Again, Defendant's claim fails for several reasons. First, Defendant failed to properly object to the underlying scientific methodology used by the witness by requesting a *Frye* hearing and presented no articulable grounds for this Court to believe that a *Frye* hearing was warranted. *Freeman*, 128 A.3d at 1246. Therefore, his claim has been waived. *Latham*, 2702 EDA 2010, 2014 WL 10979805, at *2-3.

Moreover, contrary to the assertions made by Defendant, this Court had confidence that the methodology used by the Commonwealth's expert witness is generally accepted within the

---

[26] Defendant further seems to complain in his Statement that Defendant's arrest warrant was invalid based on the uncertainty of the fingerprint analysis, and that therefore Defendant's suppression motion should have been granted. However, Defendant failed to argue during the suppression hearing that the affidavit lacked probable cause based on the inaccuracy of the fingerprint analysis and has therefore waived this claim. *See* Suppression Hr'g Tr. 155:16-18, March 16, 2015 (Defense counsel stating "Whether the fingerprint confirmation is accurate or not is a matter for trial.")

34

scientific community. Defendant introduced into evidence a chapter of a report published by the National Academy of Sciences in 2009 (hereinafter "NAS Report").[27] D-2; *see* Trial Tr. 92:7-12, March 18, 2015. This report indicates that fingerprints have been used to identify people for more than a century, and that fingerprint analysis technique used in this case, the "ACE-V" technique, "has been described in forensic literature as a means of comparative analysis of evidence since 1959." NAS Report at 136-37. Although the NAS Report argues that the process is too subjective and should involve greater documentation, and recommends that the scientific community conduct additional research to make improvements to the process, this does not equate to the methodology no longer being generally accepted. *Id.* at 142-45.

While fingerprint analysis does not contain a statistical probability of accuracy, this is not to be confused with a lack of scientific certainty. Unlike DNA analysis, it cannot be said that to sets of prints match to a statistical degree. Trial Tr. 88, March 18, 2015. But, similar to DNA analysis, fingerprints are unique to individuals. *Id.* at 93-94, 96. The basis for the examiner's opinion is on the quality and quantity of matching significant characteristics *Id.* at 70-74. Because there is question as to how to appropriately quantify the degree of matching characteristics, "[t]he fingerprinting analysis community "actively discourages members from testifying in terms of the probability of a match." NAS Report at 141.

The Superior Court of Pennsylvania has consistently held that fingerprint evidence is admissible for the purposes of identification. However, "the probative value of that evidence depends entirely on the circumstances of each case." *In re M.J.H.,* 988 A.2d 694, 697 (Pa. Super. Ct. 2010) (*quoting Commonwealth v. Cichy,* 323 A.2d 817, 818 (Pa. Super. Ct. 1974)).

---

[27] National Research Council, National Academy of Science, *Strengthening Forensic Science in the United States: A Path Forward* (Feb. 18, 2009).

35

Here, Defendant successfully cross-examined the expert on the credibility of his analysis. He challenged the number of matching significant characteristics between Defendant's known fingerprint and the latent print recovered on the vehicle.[28] Trial Tr. 86, March 18, 2015. He challenged that there was no statistical probability to the match. *Id.* at 88:15-17. He challenged that the expert's Automated Fingerprint Identification System ("AFIS") has never been "accredited by any agency or any people as the right place to examine prints" *Id.* at 90:16-18. He got the expert to admit that his conclusions were based on a "total, totally, totally, totally [sic] subjective analysis." *Id.* at 99:14-25. Defendant's complaints about the accuracy of the analysis, absent a *Frye* hearing, appropriately went to the weight of the evidence, and not its admissibility.

Furthermore, the Commonwealth's witness was fairly qualified as an expert by the Court. Detective Dinnell has served the Montgomery County Detective Bureau Forensic Services Unit since 1999, and has 37 years of experience in law enforcement. Trial Tr. 60-65, March 18, 2015. He is certified by the FBI in fingerprint documentation and comparison, and by the Pennsylvania State Police ("PSP") as an AFIS operator. *Id.* He also attended fingerprint and forensic training courses through the FBI and at Northwestern University. *Id.* Detective Dinnell is required to pass a proficiency test every year in order to maintain his certification with PSP. *Id.* at 66. He is also a member of the International Association of Identification and its Chesapeake Bay Division, which require courses and training. *Id.* at 67. Detective Dinnell's current responsibilities include processing crime scenes and analysis of forensic evidence. *Id.* at 60-65. As of 2012, he had examined well over 5,000 latent fingerprints and palm prints in the course of his duties. *Id.* He

---

[28] Detective Dinnell testified that the partial fingerprint on the exterior window on the driver's side of the car was a match to Defendant. Trial Tr. 82, March 18, 2015. It was a seventeen-point match, meaning that "[t]here were 17 significant characteristics or matching characteristics between the [partial] print and the known print listed to [Defendant]." *Id.* Detective Dinnell testified that there is "no industry standard" as to what the minimum number of matching characteristics which are necessary to determine two sets of fingerprints match, but generally twelve is the minimum standard. *Id.* at 82, 88-89. The FBI has not set a minimum standard, and instead intentionally relies on examiners to use both a quantitative and qualitative determination. *See* NAS Report at 139.

had twice previously been qualified as an expert in the Court of Common Pleas. *Id.* at 68-69. The undersigned found he had adequately established expertise to allow him to testify pursuant to Rule 702. Defendant's claim on appeal that the witness was merely a police officer lacking in formal training has no merit. Formal academic education on a subject matter is not required for expert certification. *Baez*, 720 A.2d at 727.

Finally, when asked by the Court, Defendant declined to object to the witness's certification as an expert following the *voir dire*. Trial Tr. 69:11-17, March 18, 2015. Therefore, his claim that the witness was unqualified as an expert is waived.

## V. Statements Made by the Prosecutor During the Closing Statement Do Not Warrant a Mistrial (Issue 6).

Defendant complains that this Court erred in overruling his objection to a remark made by the prosecutor in her closing statement. The standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. *Commonwealth v. Rivera*, 939 A.2d 355, 357 (Pa. Super. Ct. 2007).

Not every unwise or irrelevant remark made by counsel during the course of trial will justify a reversal. *Commonwealth v. Goosby*, 301 A.2d 673, 674 (Pa. 1973). Where a prosecutor's arguments are improper, they generally will not form the basis for a new trial unless the comments unavoidably prejudiced the jury by "forming their minds a fixed bias and hostility toward the defendant, so that they could not fairly weigh in his behalf such circumstances of doubt, extenuation or degree of guilt that may be present in the case," and thus prevented a true verdict. *Commonwealth v. Wiggins*, 328 A.2d 520, 523 (Pa. Super. Ct. 1974). The question on review of such a claim is whether the defendant was deprived of a fair trial, not a perfect one. *Commonwealth v. Toritto*, 67 A.3d 29, 37 (Pa. Super. Ct. 2013).

37

Provided that he or she does not assert personal opinions, a prosecutor may, within reasonable limits, comment on the credibility of a Commonwealth witness, especially where that credibility is attacked by the defense. *See Commonwealth v. Barren*, 462 A.2d 233, 235 (Pa. 1983) (finding that where defense counsel questioned the credibility of a victim's testimony, the prosecutor was entitled to remark during his closing statement that the victim had testified truthfully).

In *Commonwealth v. Rivera*, the Superior Court held that a prosecutor may not argue to the jury that the jury must believe that government agents are lying in order to find the defendant not guilty.[29] 939 A.2d 355, 358 (Pa. Super. Ct. 2007). The Superior Court acknowledged that there was no Pennsylvania case on point, but noted that such an argument by the prosecution goes beyond the issue of guilt and innocence of the accused and "is calculated to inflame and prejudice the jury members against a defendant." *Id.* However, rather than grant a mistrial, the Court remanded the case to the trial court for a hearing on whether prosecutorial misconduct warranting a new trial had occurred.[30]

Prompt curative instructions to the jury can cure prejudice created by inappropriate comments and ensure a fair trial. *See Commonwealth v. Cannon*, 327 A.2d 45, 47 (Pa. 1974) (finding no grounds for a mistrial where the court instructed the jury to disregard prosecutors statements accusing a witness of perjury and stating "Where as here it clearly did not affect the verdict or produce a substantial prejudice against the accused, this type of errant conduct is best cured by appropriate cautionary instructions such as were given here."); *Commonwealth v. Beavers*, 424 A.2d 1313, 1319 (Pa. 1981) (finding no mistrial where the trial court instructed the

---

[29] The closing statement made by the prosecutor in *Rivera* included the following: "What a reasonable doubt means is that we didn't prove the case, that these officers didn't do their jobs, they are all a bunch of liars. These officers did their jobs. I want you to tell them that they did their job." *Rivera*, 939 A.2d at 357.

[30] The trial court in *Rivera* failed to file a 1925(a) opinion.

38

jury to disregard the prosecutor's statement indicating that the defendant had the burden of proving his innocence); *Commonwealth v. Maloney*, 365 A.2d 1237, 1241 (Pa. 1976) (finding no mistrial where the court gave a curative instruction after a prosecutor's improper reference to defendant's silence).

In the instant case, the closing remarks of the prosecutor to which defense counsel objected were as follows:

> Prosecutor: As [defense counsel] was just saying, your role of fact-finder is a vital one in this case. Shortly [the trial judge] will instruct you on the law that you are to consider. But you as fact-finder, as you've heard from the very beginning, is to listen, gather all the information in front of you, to be the fact-finder, it's your job, the job you took an oath to do, to look through the smoke and mirrors that have been put in front of you by the defense. Use your common sense. It's your job to judge credibility of each witness. I submit that if you buy the defense's theory in this case, you've been lied to by an awful –
>
> Defense counsel: Objection.... She said if you buy the defense, then you've been lied to.
>
> Prosecutor: By the witnesses on the stand.
>
> Court: Well, the jury will weigh credibility. I'll speak to that in my closing charge. It's your collective understanding of the case, so continue. It's argument. This is pure argument at this point. Continue.
>
> Prosecutor: As I was saying, if you buy the defense in this case, then you've been lied to by an awful lot of people that took the stand to speak. You've been lied to by detectives. You've been lied to by overnight patrol officers that responded to the shooting. You've been lied to by a security guard just doing his job and patrolling. You've been lied to by experts that testified to their knowledge, training and experience. And you've been lied to by the defendant in his own statement.

Trial Tr. 24:4-25:17, March 19, 2015.

While the remarks made by the prosecutor were improper, *Rivera*, 939 A.2d at 358, they do not warrant a mistrial in the instant case. First, the undersigned is not convinced that these remarks alone would have created fixed bias and hostility towards Defendant in the minds of the

39

jury, considering the general propriety of the closing statement and fair conduct over the course of the trial. Second, this Court gave a prompt instruction in response to the objection, advising the jury members that they were listening to argument, and that they alone could weigh the credibility of the witnesses in the case. Furthermore, the undersigned gave additional instructions during the final jury charge advising the jury members that closing arguments given by the attorneys were not to be considered as evidence. Trial Tr. 76:11-21, March 19, 2015. The undersigned believes that despite the errant remark, because of this Court's instructions, Defendant received a fair trial. *See Commonwealth v. Miller*, 1626 EDA 2014, 2015 WL 6736526, at *17 (Pa. Super. Ct. Aug. 5, 2015) ("The law presumes the jury will follow the instructions of the court.") (quoting *Commonwealth v. Eichinger*, 108 A.3d 821, 846 (Pa. 2014)).

## VI.     There was Sufficient Evidence to Sustain a Conviction on All Counts (Issues 1, 5).

Defendant complains that the evidence was insufficient to support a conviction on the charges. Defendant moved for a judgment of acquittal pursuant to Rule 606 of the Pennsylvania Rules of Criminal Procedure. Trial Tr. 38:25-39:2, 42:6-14, March 19, 2015.

To judge a claim of insufficiency of evidence, an appellate court must determine whether "the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." *Commonwealth v. Fears*, 836 A.2d 52, 58-59 (Pa. 2003). The Commonwealth may prove all elements beyond a reasonable doubt through the use of wholly circumstantial evidence. *Id.* The evidence is sufficient "unless the proof relied upon for a conviction is so weak and inconclusive that as a matter of law no probability of fact can be

40

drawn from the combined circumstances." *Commonwealth v. Rawles*, 462 A.2d 619, 622 (Pa. 1983). The trier of fact is "free to believe all, part, or none of the evidence." *Commonwealth v. Burton*, 2 A.3d 598, 601 (Pa. Super. Ct. 2010) (quoting *Commonwealth v. Galvin*, 985 A.2d 783, 789 (Pa. 2009)). Evidentiary sufficiency presents a question of law. Therefore, the appellate court's standard of review is de novo, and its scope of review is plenary. *Commonwealth v. Meals*, 912 A.2d 213, 218 (Pa. 2006).

    A.    There was Sufficient Evidence to Find Defendant Guilty of Attempted First Degree Murder, Aggravated Assault, and Robbery of a Motor Vehicle.

Defendant challenges the sufficiency of the evidence for his convictions for attempted first degree murder,[31] aggravated assault,[32] and robbery of a motor vehicle,[33] based on his theory of self-defense.

Section 505 of the Pennsylvania Crimes Code outlines when it is justifiable to use force against another person in the interest of self-protection. *See* 18 Pa. C.S.A. § 505. A defendant has no burden to prove he acted in self-defense. *Commonwealth v. Smith*, 97 A.3d 782, 786 (Pa. Super. Ct. 2014). But before the issue of self-defense may be submitted to a jury for consideration, there must be some evidence, from whatever source, to justify a finding of self-defense. *Commonwealth v. Mayfield*, 585 A.2d 1069, 1070-71 (Pa. Super. Ct. 1991). "Such evidence may be adduced by the defendant as part of his case, or conceivably, may be found in the Commonwealth's own case in chief or be elicited through cross-examination." *Commonwealth v. Rose*, 321 A.2d 880, 884 (Pa. 1974).

The Commonwealth carries the burden to prove beyond a reasonable doubt that the defendant was not acting in self-defense, and can carry that burden by establishing either that:

---

[31] 18 Pa. C.S.A. § 901 (A); Pa. C.S.A. § 2502(A).
[32] 18 Pa. C.S.A. § 2702(A)(1).
[33] 18 Pa. C.S.A. § 3702(A).

"1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety." *Smith*, 97 A.3d at 787. The defendant must have had both a subjective belief that he was in imminent danger, and an objectively reasonable belief that the use of force was necessary to protect against death or serious bodily injuries. *Id.* The reasonableness of a defendant's belief can be determined by considering such factors as "whether complainant was armed, any actual physical contact, size and strength disparities between the parties, prior dealings between the parties, threatening or menacing actions on the part of complainant, and general circumstances surrounding the incident." *Id.* at 788. The defendant also must not have "used more force than reasonably necessary to protect against death or serious bodily injury." *Id.* Finally, the defendant "must be free from fault in provoking or escalating the altercation that led to the offense." *Id.*

A fact-finder is not required to believe the testimony of a defendant who raises the claim of self-defense. *Id.* However, disbelief of defendant's testimony alone will not afford enough affirmative proof to disprove the claim. *Commonwealth v. Torres*, 766 A.2d 342, 345 (Pa. 2001) (finding that there was insufficient evidence to disprove defendant's self-defense claim where the Commonwealth's case did not provide evidence of who the initial aggressor was, or a motive for the defendant to be the initial aggressor). The testimony of the complainant as a witness to the incident is sufficient to refute a self-defense claim. *Smith*, 97 A.3d at 788.

In the case *sub judice*, evidence of self-defense was introduced in two ways. First, one of the Commonwealth's witnesses testified that before the shooting he heard someone say "leave me alone." Trial Tr. 13:11-13, March 18, 2015. Second, Defendant's statement, which was introduced into evidence, related that according to Defendant's version of events, Defendant

42

entered the complaining witness's car in order to sell him marijuana, and the complaining witness then became sexually aggressive. *Id.* at 212-213. In Defendant's statement he says that they "both got out of the car basically at the same time. I got out of the passenger side and he got out of the driver's side of the blue car. I walked around to the driver's side and the big white guy [(the complaining witness)] was leaning up against the car. I walked over to him and he stood up like he was trying to scare me so I took out my gun and I shot him in the face. . . . He fell down on the parking lot and I kicked him out of the way so I could get in the car. After he was out of the way I got inside of the driver's seat and I started the car up and I left." Trial Tr. 213:8-22, March 18, 2015. The complaining witness testified that he is not able to recall the events of the evening. Trial Tr. 185, March 18, 2015.

The Commonwealth presented sufficient evidence before the jury to disprove Defendant's claim of self-defense beyond a reasonable doubt. First, there was no testimony regarding whether it was Defendant or complaining witness who said "leave me alone." Second, Defendant did not testify, and his statement to the police may have only been afforded so much credibility by the jury. In the light most favorable to the Commonwealth, Defendant's placement at the scene and the circumstantial evidence surrounding Defendant's initial lies to the police, Defendant's carrying of an unlicensed firearm, and Defendant's stealing the complainant's vehicle after the shooting, are enough to refute Defendant's claim of self-defense beyond a reasonable doubt. *C.f. Torres*, 766 A.2d at 345 (finding insufficient proof to disprove self-defense where the Commonwealth provided no testimony to indicate that the defendant was the initial aggressor, provided no motive for the defendant to be the initial aggressor, where the defendant's credibility was corroborated by stipulations to the defendant's reputation for

43

peacefulness in the community, and where there was a stipulation to complainant's history of violent behavior).

Furthermore, if the jury did believe Defendant's statement to be a truthful version of the events, his conduct does not comport with lawful self-defense. Once Defendant exited the vehicle, *he* approached the complainant, who was leaning against the vehicle. Complainant "stood up" as if to scare Defendant, and for that Defendant shot him in the face, kicked him out of the way, and stole his car.[34] No matter what events transpired inside the vehicle, by the time of the shooting, (1) Defendant could not have reasonably believed he was in danger of death or serious bodily injury, nor did he assert that he was, (2) Defendant provoked any showing of force by the complainant by confronting him by the drivers'-side door, and (3) Defendant, who used to live in the apartment complex, could have retreated to safety. *Smith*, 97 A.3d at 787. Therefore, it may not only be the jury's disbelief of Defendant's theory, but the jury's *belief* in the admissions in Defendant's own statement which refuted his self-defense claim.

B.     There was Sufficient Evidence to Convict Defendant of Recklessly Endangering Another Person.

Defendant was charged with the reckless endangerment of the complaining witness and of the officer whose car was struck during Defendant's flight. Defendant complains that there was insufficient evidence to sustain a conviction of recklessly endangering another person[35] because the Commonwealth argued that Defendant's actions were willful and premeditated.

A person commits the offense in question if he "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S.A. § 2705. The crimes code describes the term "reckless" as:

---

[34] Defendant only decided to abandon the vehicle after accidentally hitting a police cruiser who was arriving at the scene.

[35] 18 Pa. C.S.A. § 2705.

44

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b). "This statutory provision was directed against reckless conduct entailing a serious risk to life or limb out of proportion to any utility the conduct might have." *Commonwealth v. Reynolds*, 835 A.2d 720, 727 (Pa. Super. Ct. 2003)

In the instant case, Defendant shot the complaining witness in the face and drove away in his car, crashing it into a police vehicle that was arriving on the scene. With such conduct, Defendant very consciously disregarded the risk of injury to the complainant and to the officer.

While Defendant's actions may be more aptly described as willful or premeditated, particularly in regards to the shooting, this does not negate that Defendant also acted recklessly, as it is a lower mental state. *See* 18 Pa.C.S.A. § 302(e) (where negligence is an element of an offence, it is also established if a person acts intentionally or knowingly); *Commonwealth v. Carroll*, 2007 PA Super 340, 936 A.2d 1148 (2007) (The term "grossly negligent" is equivalent to the term "reckless."). Defendant was rightfully convicted of the charge of reckless endangerment.

C.      There was Sufficient Evidence to Convict Defendant of Unsworn Falsification to Authorities.

Defendant complains that there was insufficient evidence to convict him for the charge of unsworn falsification to authorities,[36] because it was based solely on Defendant's "denial of the fingerprint." A person commits unsworn falsification, as charged, when "with intent to mislead a

---

[36] 18 Pa. C.S.A. § 4904(a)(1).

45

public servant in performing his official function, he . . . makes any written false statement which he does not believe to be true." 18 Pa.C.S.A. § 4904(a)(1).

Here, when Defendant gave a statement to the police on November 2, 2013, he denied touching the vehicle.[37] Trial Tr. 134:19-24, March 18, 2015. He also denied any involvement in the events on Sunday, October, 20, 2013. *Id.* at 130:2-138:22. He said he had never seen the complainant before, that he had never seen the vehicle, that he has never fired a firearm, and that he had been asleep at his father's house during the entire incident. *Id.* Defendant stated that he had heard about the incident from a local news source. *Id.* at 133:22-134-2.

However, in Defendant's second statement to the police, given on December 18, 2013, he admitted to the shooting, refuting everything he said in his first statement. *Id.* at 210:13-219:13. And when asked "Did you tell the truth in the first statement you gave to Police?" he answered "No." *Id.* at 211:13-15. Aside from Defendant's second statement, other circumstantial evidence corroborated his involvement in the crime.[38]

Therefore, Defendant's conviction for unsworn falsification was not based solely on Defendant's denial about touching the vehicle, but on the entirety of Defendant's first statement. Furthermore, it was no longer of any import whether Defendant was responding in his first statement to whether he had ever touched the vehicle or had touched it on the night of the incident—Defendant's negative answer to either query was proven to the jury beyond a reasonable doubt to have been a lie.

---

[37] There was debate at the suppression hearing about whether denied ever touching the vehicle, or denied touching the vehicle on the night in question. *See* Section II(B), *supra.*

[38] Defendant matches the loose description given by the eye-witnesses, he has lived at the apartment complex where the crime occurred, his cell phone was in the vicinity of the crime when it occurred, and his fingerprint was found on the vehicle belonging to the complainant.

D.      There was Sufficient Evidence to Convict Defendant of Possession of a Firearm by a Person not to Possess.

Defendant complains that there was insufficient evidence to convict him for possession of a firearm by a person not to possess,[39] because the offense was based on a juvenile robbery adjudication.

Persons convicted of certain enumerated felonies are prohibited from possessing or using a firearm. 18 Pa. C.S.A. § 6105(a)(1). "In order to establish a *prima facie* case of [p]erson not to [p]ossess [f]irearms, the Commonwealth must prove that a person possessed a firearm and had a prior conviction of an offense listed in 18 Pa.C.S. section 6105(b)." *Commonwealth v. Williams*, 911 A.2d 548, 550–51 (Pa. Super. Ct. 2006) (citation omitted). The enumerated offenses listed in section (b) include the offense of robbery under section 3701. *See* 18 Pa.C.S. § 6105(b). The statute specifically extends the prohibition to persons who have been adjudicated delinquent:

> In addition to any person who has been convicted of any offense listed under subsection (b), the following persons shall be subject to the prohibition of subsection (a): . . .
> A person who was adjudicated delinquent . . . as a result of conduct which if committed by an adult would constitute an offense under section[] . . . 3701.

18 Pa. C.S.A. § 6105(c)(7).

Here, the Commonwealth presented evidence of the juvenile adjudication to the jury. Trial Tr. 149:12-19, March 19, 2015. Therefore, this Court did not err in using Defendant's prior adjudication for robbery as the predicate offense for the person not to possess conviction pursuant to § 6105.

However, in reviewing this matter, the undersigned has found an error in the proceedings. A violation of the persons not to possess statute is, by default, graded as a misdemeanor of the first degree. 18 Pa. C.S.A. § 6119. The Pennsylvania Supreme Court decided in *Commonwealth*

---

[39] 18 Pa. C.S.A. § 6105(A)(1).

*v. Hale*, 128 A.3d 781 (Pa. 2015), that for purposes of § 6105(a.1)(1), which applies a higher grading scheme based on the underlying conviction for the offense, a juvenile adjudication is *not* the equivalent of a conviction. Accordingly, the gradation enhancement found at § 6105(a.1)(1) cannot apply to prior juvenile adjudications. A court may sentence a defendant more harshly due to his prior juvenile record, but must not stray from the legal parameters of a sentence for a first-degree misdemeanor.

Instantly, the Commonwealth erroneously charged the offense as a second-degree felony and Defendant was sentenced to three years' probation. However, Defendant has not challenged the grading of the offense, either at trial or on appeal, and this Court declines to *sua sponte* address a correction on those grounds.

## VII. Defendant's Motion for Extraordinary Relief was Properly Denied (Issue 14).

Defendant complains that this Court erred in denying his Motion for Extraordinary Relief Pursuant to Rule 704(B), which he filed on September 2, 2015. In Defendant's motion, he argued that a new trial was warranted because the jury foreperson had been found to have had prior personal knowledge of Defendant's placement in a juvenile rehabilitation center and Defendant was therefore denied a fair trial. On September 10, 2015, the Court held an evidentiary hearing on Defendant's motion, and on October 2, 2015, the motion was denied.

Defendant revived his argument in his post-sentence motion filed on October 29, 2015, which stated that this Court erred in denying the motion and which again requested a new trial. Defendant also requested leave to supplement his original motion "with additional documentary evidence of the jury foreperson's juror questionnaire." On November 3, 2015, this Court issued an order granting leave to supplement the record with the juror questionnaire within twenty days

48

and stating that "In default thereof, same motion is DENIED." Defendant did not supplement the record with the juror questionnaire.

The facts surrounding the possible juror misconduct are as follows. The jury foreperson was a staff member at New Life Residential Program for Youth ("New Life"), a drug and rehabilitation residential facility for juveniles, while Defendant was a resident there. The jury foreperson did not disclose his employment in his juror questionnaire, a fact which is not in dispute.[40] During individual *voir dire* of the jury panel prior to trial, defense counsel asked the potential juror about his employment as a correctional officer at the State Correctional Institution at Graterford. Trial Tr. 116:7-9, March 17, 2015. The potential juror stated that he had been working there for 19 years, and did not mention any other present or past employment. *Id.* at 115:16-117:6. He reaffirmed that he did not answer in the positive to any of the other of the Court's general *voir dire* questions, except that a member of his family had been convicted of a crime. *Id.* at 115:18-116:3. He also stated that nothing in his experience would affect his ability to be a juror. *Id.* at 116:16-23. The questioning was brief, and neither party moved to strike the juror for cause. *Id.* at 117:8-15.

At the post-trial evidentiary hearing on the motion for extraordinary relief, the jury foreperson admitted that while he answered on his questionnaire that in addition to his job as a corrections officer at S.C.I. Graterford, he was also employed at New Life at the time he filled out the juror questionnaire and served on the jury. Mot. Hr'g 7:22-8:4, September 10, 2015. The juror stated that he only listed his primary job in response to the question on his employment.[41] *Id.* at 8:5-8. He also confirmed that he did not answer in the affirmative when this Court queried as to whether any of the potential jurors knew Defendant. *Id.* at 8:9-14.

---

[40] This Court understands that the questionnaires are no longer available.

[41] It is this Court's belief that the standard question regarding employment on the juror questionnaire reads "Please indicate your current occupation and employment history."

The jury foreperson began his employment at New Life in 2006, eventually becoming the cottage supervisor of McCreary Hall. Mot. Hr'g 9:13-10:9, September 10, 2015. Across the street from McCreary Hall was Ranch House, a similar cottage, where it was stipulated that Defendant was housed during the period of May 2010 to February 2011. *Id.* at 10:12-16, 11:20-12:5. The program houses about forty-four residents, in five different cottages, who stay between six and nine months. *Id.* at 20:14-20; 21:20-24. The foreperson stated that he would be present at some of the sports activities in which children from both cottages would participate. *Id.* at 12:6-22. But he also maintained that mainly, as a supervisor, his position was administrative. *Id.* at 23:3-6. He would not have known Defendant's name. *Id.* at 26:20-27:13.

The juror clarified that at that time of the commencement of trial, he did not recognize Defendant. Mot. Hr'g 13:2-5, 24:11-12, September 10, 2015. According to the jury foreperson, this is because at the time Defendant was living at New Life, Defendant would have been considerably younger (approximately fourteen years old) than he was at the trial (nineteen years old), and that the jury foreperson deals with "hundreds of kids a year." *Id.* at 13:7-14:4, 20:23-21:4.

The juror stated that "a couple of days" into the three-day trial, he may have begun to recognize Defendant.[42] *Id.* at 14:14-25, 24:13-15, 26:2-10. He did not bring up his ruminations with the Court because he "wasn't absolutely sure" and he "could have been mistaken." *Id.* at 15:17-18; 17:6-10; 26:11-13. The juror also was not certain if he potentially recognized Defendant from Carson Valley, a different residential placement program at which he had been employed. *Id.* at 15:24-16:3. Both facilities are for juveniles that have been adjudicated delinquent. *Id.* at 16:14-18.

---

[42] The jury foreperson stated "You know, I thought I may have known him, but I wasn't positive. You know, like I said, we are talking years later," and also "I thought I might have known him, but I wasn't exactly sure if I had known him." Mot. Hr'g 14:17-19, 14:23-25, September 10, 2015.

He did not discuss his contemplations with any other jurors. Mot. Hr'g 15:2-8, 18:9-20, 18:21-24, 24:22-24, September 10, 2015. The jury foreperson stated that "Actually, as the trial went on, I never thought about it again." *Id.* at 18:17-18. The jury foreperson also stated his potential recognition of Defendant and implied knowledge of a juvenile adjudication of some sort did not enter into his mind when deciding whether Defendant was guilty of the instant case. *Id.* at 19:8-19, 24:16-21.

Pursuant to Rule 704 of the Pennsylvania Rules of Criminal Procedure, trial counsel may make an oral motion for extraordinary relief. Pa. R. Crim. P. 704(B). Section B of the rule reads in full:

**(B) Oral Motion for Extraordinary Relief.**
(1) Under extraordinary circumstances, when the interests of justice require, the trial judge may, before sentencing, hear an oral motion in arrest of judgment, for a judgment of acquittal, or for a new trial.
(2) The judge shall decide a motion for extraordinary relief before imposing sentence, and shall not delay the sentencing proceeding in order to decide it.
(3) A motion for extraordinary relief shall have no effect on the preservation or waiver of issues for post-sentence consideration or appeal.

*Id.* As the motion is an oral motion, written motions for extraordinary relief have been deemed improper. *Commonwealth v. Grohowski*, 980 A.2d 113, 115-16 (Pa. Super. Ct. 2009).

The comment to the rule clarifies that, regardless of the gravity or meritoriousness of the claims, a trial court should rule favorably on such a motion only "when there has been an error in the proceedings that would clearly result in the judge's granting relief post-sentence," for "those errors so manifest that immediate relief is essential," and "when there has been an egregious error in the proceedings, [and] the interests of justice are best served by deciding that issue before sentence is imposed." Pa. R. Crim. P. 704 cmt. The non-exhaustive examples given in the comment for when such a motion would be appropriate are "when there has been a change in case law, or, in a multiple count case, when the judge would probably grant a motion in arrest of

51

judgment on some of the counts post-sentence." *Id.* A motion for extraordinary relief is not a substitute for an issue that should be raised in a post-sentence motion. *Grohowski*, 980 A.2d at 115-16.

The trial court "may summarily deny the motion or decide it on the merits." *Id.* The trial court cannot treat the motion as a post-sentence motion and defer action on it; the trial court must decide the matter before it. *Commonwealth v. Fisher*, 764 A.2d 82, 85 (Pa. Super. Ct. 2000). The rule allowing for a motion for extraordinary relief does not provide for the conduct of a separate evidentiary hearing to relitigate an issue which has been ruled upon during the course of the trial. *Commonwealth v. Lee*, 703 A.2d 470, 476-77 (Pa. Super. Ct. 1997).

In the instant matter, this Court properly denied Defendant's motion for extraordinary relief as it did not present an issue that rose to the level of an egregious and manifest error in the trial proceedings that warranted immediate relief. Such a motion is meant to be raised orally and be decided swiftly and summarily, and cause no delay in proceedings. Pa. R. Crim. P. 704. In short, whether the sought-after relief is warranted should be fairly obvious. This Court understands that the issue of a tainted juror is somewhat extraordinary, and that Defendant's counsel desired to raise the issue promptly when he learned of new facts surrounding the propriety of the trial proceedings. However, the issue necessitated an evidentiary hearing and the trial court's careful consideration of whether Defendant was in fact denied a fair trial based on the juror's connection to the case, and was therefore did not constitute the type of blatant error that merits relief contemplated by Rule 704(B).[43]

---

[43] The undersigned acknowledges that procedural errors were made surrounding the motion. First, Defendant raised the matter in a written motion rather than at an oral proceeding, so the Court did not initially have the authority to entertain the motion. *Commonwealth v. Grohowski*, 980 A.2d 113, 115-16 n.6 (Pa. Super. Ct. 2009); *but see Commonwealth v. Dorm*, 971 A.2d 1284, 1288-89 (Pa. Super. Ct. 2009) (stating that a trial court, even acting *sua sponte*, may grant a new trial when the interest of justice so requires). However, once the Court began the hearing and the matter was raised orally, the Court was confronted with the problematic scenario of being constrained to make a ruling on the motion prior to sentencing, pursuant to the rule and to *Fisher. See* Pa. R. Crim. P. 704;

Furthermore, after careful consideration of the merits of the underlying issue, this Court found that a new trial was not warranted.[44] Juror misconduct occurs when a selected juror does not answer an unambiguous *voir dire* question truthfully. *See, e.g., Commonwealth v. Kelly*, 609 A.2d 175 (Pa. Super. Ct. 1992) (granting defendant a new trial when juror did not truthfully answer whether he was qualified to be a juror due to a prior felony conviction and holding that statutory disqualifications presume prejudice to the accused). When a *voir dire* question is ambiguous, the party contesting the juror's qualifications is responsible for seeking clarity in the juror's response. *See, e.g., Commonwealth v. Didyoung*, 535 A.2d 192 (Pa. Super. Ct. 1988) (holding no new trial was warranted where defense counsel failed to specifically question whether prospective juror's extended family had any ties with law enforcement).

A new trial is granted in the face of juror misconduct only where the misconduct objectively causes prejudice to the accused. *Commonwealth v. Pope*, 14 A.3d 139 (Pa. Super. Ct. 2011). The trial court should consider (1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature. *Id.* For example, new trials were

---

*Commonwealth v. Fisher*, 764 A.2d 82, 85 (Pa. Super. Ct. 2000). To make a considered ruling on whether an obvious and egregious violation had occurred during trial, the Court had to hear the matter. *See, e.g., Commonwealth v. Rapley*, 1083 EDA 2014, 2014 WL 10753689, at *3 (Pa. Super. Ct. Dec. 16, 2014) (deciding the merits of a motion for extraordinary relief based on examination of the merits of the underlying claim of a violation of the appellant's speedy trial rights). Although an evidentiary hearing is not warranted where a matter was litigated during the course of the trial, here, it was the new and unexpected matter of the tainted juror which came before the Court which necessitated a hearing. *Cf. Commonwealth v. Lee*, 703 A.2d 470, 476-77 (Pa. Super. Ct. 1997) (finding that upon a motion for extraordinary relief, a pre-sentence judge was not entitled to a hearing on the issue of juvenile decertification because "The Rule does not provide for the conduct of a separate evidentiary hearing to relitigate an issue which has been ruled upon pre-trial."). However, the hearing necessary to decide the motion delayed the sentencing proceeding, which is impermissible under the rule. Pa. R. Crim. P. 704. The sentencing had previously been continued from July 7, 2015, to August 3, 2015, and again to September 3, 2015, for unrelated reasons. The hearing on the motion for extraordinary relief, presented to the Court on September 2, 2015, the day before sentencing was to occur, ultimately caused a delay of the sentencing proceeding until October 19, 2015. Regardless of the procedural errors surrounding the Motion for Extraordinary Relief, the issue of the tainted juror was preserved for appellate review by Defendant's filing of a post-sentence motion stating the same claim.

[44] The Court reconsidered the issue in full when it was presented as a post-sentence motion.

not warranted where a juror made an unauthorized visit to a crime scene when the physical aspects to the crime scene were not crucial to the issue, *id.*, where jurors were exposed to extraneous information during deliberations, *Commonwealth v. King*, 990 A.2d 1172 (Pa. Super. Ct. 2010), and where jurors took their notes of trial into deliberations, *Commonwealth v. Neff*, 860 A.2d 1063 (Pa. Super. Ct. 2004).

A new trial may also be awarded where the jury has been exposed to improper references of prior criminal activities of the defendant. *Commonwealth v. Valerio*, 712 A.2d 301, 303 (Pa. Super. Ct. 1998). Reference to a defendant's criminal history is sometimes admissible, such as when used to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident, or to impeach a defendant's credibility should he take the witness stand. Pa. R. E. 404, 609. There is no per se rule requiring a new trial when an improper reference has been made. *Valerio*, 712 A.2d at 303. The court must consider the nature of the reference to the prior criminal activity and whether it was intentionally introduced by the Commonwealth. *Id.* When the court is convinced beyond a reasonable doubt that the error did not contribute to the verdict, because the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the improper reference so insignificant in comparison, the court may hold that reversal is not required because the error was harmless. *Commonwealth v. Garcia*, 712 A.2d 746, 749 (Pa. 1998).

A court may take evidence to determine whether extraneous influences may have affected the jury's deliberations. *Commonwealth v. King*, 990 A.2d 1172, 1181 (Pa. Super. Ct. 2010). "When the facts surrounding the possible [juror] misconduct are in dispute, the trial judge should examine the various witnesses on the question, and his findings of fact will be sustained unless there is an abuse of discretion." *Commonwealth v. Pope*, 14 A.3d 139, 145 (Pa. Super. Ct. 2011).

The decision whether to declare a mistrial when jurors have been improperly exposed to a defendant's criminal history is likewise within the sound discretion of the trial judge. *Valerio*, 712 A.2d at 303.

This Court agrees with Defendant that the instant question was unambiguous, and an average juror should likely have listed all current places of employment in response. However, the average juror probably would not have complied with the request to list their entire employment history, and neither counsel pressed this juror or *any* of the potential jurors to comply with providing their previous places of employment. Had the juror no longer worked at New Life at the time of the trial—even by a day—the juror would have had the same extraneous influence without any juror misconduct having occurred. Therefore, Defendant did not display the proper vigilance in covering the area of juror's employment history. *Cf. Didyoung*, 535 A.2d 192 (defense counsel failed to press the prospective juror on whether their extended family had ties to law enforcement, when the question only questioned them about their "family.")

Furthermore, Defendant failed to prove that he was prejudiced by the omission on the juror's questionnaire. *Pope*, 14 A.3d at 145 (the defendant bears the burden to prove prejudice in the face of juror misconduct). The question considered by this Court was whether the jury foreperson's extraneous influence would have objectively prejudiced an average, reasonable juror. *Id.* The jury foreperson stated on the stand that a few days into the trial it occurred to him that he might have recognized Defendant from New Life, but that because of the passage of time and the number of youth he has worked with, it was only a fleeting thought. The jury foreperson never had any direct interaction with Defendant, did not know his name, and did not know and *still* does not know for what offense Defendant had been adjudicated delinquent. This Court was not persuaded that an average juror, who had only the slightest inkling that they may have

55

recognized a defendant from such a situation, would have been influenced in their decision-making.[45] Hazy indefinite recognition of Defendant alone does not rise to emotional or inflammatory influence.

Furthermore, this Court was convinced beyond a reasonable doubt that the extraneous information did not contribute to the verdict, because the properly admitted evidence of guilt was overwhelming and the prejudicial effect of the improper reference was insignificant in comparison. *Valerio*, 712 A.2d at 303. Nor was the extraneous information provided by the Commonwealth. *Id.* Therefore, this Court did not abuse its discretion in denying Defendant's motion for a new trial.

## VIII. Defendant has Failed To Present Any Complaints Regarding his Sentencing (Issue 15).

In his Statement, Defendant requested leave to file an amended Statement upon receipt of the transcript of the sentencing proceedings. On March 23, 2016, two days after the filing of his Statement, the transcript became available to Defendant. On April 7, 2016, this Court issued an Order allowing Defendant until April 15, 2016, to amend his Statement. To the date of the filing of this opinion, no supplemental or amended Statement has been filed by Defendant. Defendant has therefore waived any claims related to Defendant's sentencing proceeding for appellate review.

---

[45] In making its decision, the Court disregarded the juror's subjective statements that his prior experience with Defendant did not enter into his mind during deliberations.

## CONCLUSION

For all of the aforementioned reasons, this Court's decision and order should be

**AFFIRMED.**[46]

BY THE COURT:

*[signature]*

GARRETT D. PAGE,         J.

Copies of the above Opinion
Mailed on  5 - 3 - 16
By Interoffice Mail to:
Robert M. Falin, Esq., ADA Appeals Unit
Raymond D. Roberts, Esq., PD Appeals Unit
Anne Schools – Court Administration
By First Class Mail to:
Troy Walker, Defendant

*[signature]*
Judicial Secretary

---

[46] The above-signed would like to offer an apology for the length of this 1925(a) opinion. This Court has attempted to avoid a cursory examination of the issues raised by Defendant, as that would be a disservice to Defendant and to the Commonwealth, and would hinder the Superior Court's review. *See Commonwealth v. Best*, 120 A.3d 329, 341 (Pa. Super. Ct. 2015).